IN RE TYQWANE V. ET AL.*
(AC 24026)

West, McLachlan and Hennessy, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued March 25—officially released October 12, 2004

*Raymond J. Rigat,* for the appellant (respondent mother).

*Renee Bevacqua Bollier,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Susan T. Pearlman,* assistant attorney general, for the appellee (petitioner).

*Opinion*

HENNESSY, J. The respondent mother appeals from the judgments of the trial court terminating her parental rights as to her minor children, T and M.[1] On appeal, the respondent claims that the court improperly determined that (1) the termination of her parental rights was in the best interests of her children and (2) appellate review of a termination of parental rights proceeding pursuant to the clearly erroneous standard of review denies her adequate procedural safeguards. We affirm the judgments of the trial court.

---

[1] The court also terminated the parental rights of the respondent fathers of each of the children. Because neither father has appealed, we refer in this opinion to the respondent mother as the respondent.

In its memorandum of decision, the court found the following facts. The children, T and M, were born in November, 1993, and April, 1998, respectively. On March 25, 1997, after allegations that T was in immediate physical danger from his surroundings, the commissioner applied for an order of temporary custody, which was granted. A concomitant neglect petition was filed by the petitioner, the commissioner of children and families (commissioner), alleging that T was neglected in that the child was (1) being permitted to live under conditions, circumstances or associations injurious to his well-being and (2) abused in that he had a condition that was the result of maltreatment such as, but not limited to, malnutrition, sexual molestation or exploitation, deprivation of necessities, emotional maltreatment or cruel punishment.

On January 7, 1998, the respondent entered a plea of nolo contendere to an allegation of neglect in that T was denied proper care and attention. The commissioner withdrew all other allegations. The respondent was canvassed, and the plea was accepted by the court. The disposition provided for T's commitment to the commissioner from January 7, 1998, to January 7, 1999. The court also set forth written expectations for the respondent to regain custody, which the respondent signed. On December 7, 1998, the commitment was extended from January 7, 1999, to January 7, 2000. On February 26, 1999, T was returned to the respondent's care while committed to the commissioner because the respondent had complied with the court's expectations. On March 10, 1999, the commissioner filed a motion to modify the disposition from commitment to protective supervision. On March 17, 1999, the motion was granted and protective supervision was ordered to remain in effect through September 17, 1999. The respondent agreed in writing to the specific steps required to achieve reunification.

On July 10, 1999, a ninety-six hour hold was invoked on T and M. On July 14, 1999, after an allegation that both children were in immediate physical danger from their surroundings, an order of temporary custody was applied for and granted by the court. A concomitant neglect petition was filed, alleging that M was neglected in that he was (1) abandoned, (2) denied proper care and attention, physically, educationally, emotionally or morally and (3) being permitted to live under conditions, circumstances or associations injurious to his well-being. On August 16, 1999 the orders of temporary custody were affirmed and protective supervision of T was extended until further order of the court.[2]

On October 21, 1999, the respondent entered an admission on the neglect allegations concerning M. The plea was accepted by the court. The disposition resulted in M's commitment to the commissioner from October 21, 1999, to October 21, 2000.[3] The respondent then signed, and the court approved, future expectations. In addition, T's commitment also was modified from protective supervision to commitment to the custody and care of the commissioner for a period not to exceed one year.

On August 15, 2000, the commitment of the children was extended from October 21, 2000, to October 21, 2001, and the permanency plan of reunification was approved. On September 18, 2001, the commitment of the children was extended from October 21, 2001, to October 21, 2002. The court also found that the permanency plan or reunification concerning the respondent

---

[2] The record does not reveal whether the children remained in the respondent's care or were placed in foster care after the order of temporary custody was affirmed.

[3] Although the court's memorandum of decision states that M's commitment was from October 21, 1999, to October 21, 2002, our review of the record reveals that the operative dates are October 21, 1999, to October 21, 2000.

was appropriate, while efforts to reunify T with his father were not appropriate. In addition, the court approved modified expectations to which the respondent agreed.

On May 2, 2002, the commissioner filed petitions seeking to terminate the parental rights of the respondent as to both children.[4] The commissioner, pursuant to General Statutes § 17a-112, alleged three grounds for terminating the respondent's parental rights: (1) that the children were abandoned in that the respondent failed to maintain a reasonable degree of interest, concern or responsibility as to their welfare, (2) that the children had been found in a prior proceeding to have been neglected or uncared for and had been in the custody of the commissioner for at least fifteen months, and that the respondent, though provided with the specific steps necessary to facilitate their return, failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of both children, she could assume a responsible position in their lives and (3) that there is no ongoing parent-child relationship between each child and the respondent. On October 22, 2002, the termination hearing commenced. The commissioner, however, pursued termination only on the ground that the respondent had failed to achieve the requisite degree of personal rehabilitation. The hearing resumed on October 30, 2002, and closing arguments were made on November 19, 2002.

In the adjudicatory phase, the court found by clear and convincing evidence that "[the respondent] is the

---

[4] On April 30, 2002, after an evidentiary hearing, the court found by clear and convincing evidence that further efforts to reunify the respondent with her children were not appropriate. The court, therefore, did not need to make such a finding at the commencement of the termination proceedings. See General Statutes § 17a-112 (j) (1); *In re Kachainy C.*, 67 Conn. App. 401, 409, 787 A.2d 592 (2001).

parent of children who have been found by the Superior Court to have been neglected, or uncared for in a prior proceeding and has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of each child, she could assume a responsible position in the life of each child." See General Statutes § 17a-112 (j) (3) (B) (i) and (ii).

In the dispositional phase of the proceedings, the court considered and made written findings regarding the seven factors listed in § 17a-112 (k). The court recognized that the respondent "has exercised, continues to exercise and will in the future exercise poor judgment in regard to her boys." The court further recognized that the respondent "takes no responsibility for anything that has happened." The court then determined, by clear and convincing evidence, that it was in the best interests of the children that the respondent's parental rights be terminated. This appeal followed.

I

The respondent first claims that the court improperly determined that termination of her parental rights was in the best interests of her children. She claims that her parental rights should not be terminated because a very strong bond exists between herself and the children, the psychological parent is unwilling to adopt the children, adoption is unlikely given their extreme emotional and behavioral problems and termination is inimical to their best interests insofar as they will permanently and irretrievably lose their only connection to a parent. We disagree.

"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under § 17a-112 (j)] exists by

clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best [interest] of the child." (Internal quotation marks omitted.) *In re Kristy A.*, 83 Conn. App. 298, 306, 848 A.2d 1276, cert. denied, 271 Conn. 921, 859 A.2d 579 (2004).

"The standard of review on appeal [from a termination of parental rights] is whether the challenged findings are clearly erroneous. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous." (Internal quotation marks omitted.) *In re Jennifer W.*, 75 Conn. App. 485, 492–93, 816 A.2d 697, cert. denied, 263 Conn. 917, 821 A.2d 770 (2003).

"It is important to note at the outset of our analysis that in considering the evidence, we do not necessarily analyze the claim in terms of what is best for the children. Specific statutory standards necessary for termination must be met to justify termination. Consideration of the best interest of the child comes after a determination that termination is warranted." *In re Alexander T.*, 81 Conn. App. 668, 677, 841 A.2d 274, cert. denied, 268 Conn. 924, 848 A.2d 472 (2004). In addition, "the best interest of a child is not the [court's] primary focus when determining whether to grant a petition to terminate parental rights. . . . [C]oncern for the children is an additional, not an alternative, requirement for the termination of parental rights." (Citation omitted.) Id., 674 n.8.

In its analysis during the dispositional phase of the proceedings, the court found that all seven statutory criteria weighed in favor of terminating the respondent's parental rights. Moreover, it found by clear and

convincing evidence that it was in the children's best interests to terminate the respondent's parental rights. In its memorandum of decision, the court made the following findings. The department of children and families (department) became involved with the respondent in 1996 and, despite the benefit of numerous services since that time, the problems that led to the removal of the respondent's children from her care were not addressed by the respondent. She did not understand their special needs and thought that those needs would be solved on the children's reunification with her. Barbara P. Berkowitz, the children's psychologist, found that notion to be "distressing because it was insensitive to the feelings and needs of the boys." The court noted that the respondent had not taken responsibility for anything that had happened and, therefore, blamed the present circumstances on discrimination by the department, the police and the court. Of significance in that regard was Berkowitz' conclusion that "such ideation reflects little regard for the needs and best interest of the children . . . ."

The court also found that nine year old T had spent five years and three months of his life in the department's custody and that four and one-half year old M had spent three years and four months in the department's custody. Berkowitz testified that the children should not "be left in legal limbo." Rather, they need permanency and stability, and she recommended that the respondent's parental rights be terminated despite the loving relationship she had with her children. The court stated that the respondent "has exercised, continues to exercise and will in the future exercise poor judgment in regard to her boys" and noted that although an adoptive home did not exist at the time of the hearing, "there is no prerequisite that adoption will ensue before a termination of parental rights is granted." The court went on to paraphrase Berkowitz, stating that "this

is a heartbreaking situation because there are some positive feelings between each boy and [the respondent]." After noting that Berkowitz recommended termination despite evidence of a loving relationship between the respondent and her children, the court, citing *In re Quanitra M.*, 60 Conn. App. 96, 106, 758 A.2d 863, cert. denied, 255 Conn. 903, 762 A.2d 909 (2000), stated: "The Appellate Court has concluded that a termination of parental rights is appropriate in circumstances where the children are bonded with their parent if it is in the best interest of the child to do so. . . . This is such a case."[5] (Citation omitted.)

In its thorough and thoughtful decision, the court found by clear and convincing evidence that the children's best interests would be served by granting the petitions to terminate the respondent's parental rights. We conclude that the court's findings and conclusions are not clearly erroneous.

## II

The respondent also asserts that appellate review of a termination of parental rights proceeding pursuant to the clearly erroneous standard of review denies her adequate procedural safeguards on appeal. We disagree.

"[T]he rights of parents qua parents to the custody of their children is an important principle that has con-

[5] The respondent concedes that a ready adoptive home is not required before a termination of parental rights will be granted. She argues, however, that when adoption is not likely, "termination would only be warranted in such a case where either: (1) there was no bond between the parent and child; or (2) where the child was actually harmed by having any connection with the parent." The respondent has provided no case law to support this proposition. Moreover, her argument stands in contrast to General Statutes § 17a-112 (j). In any event, "[a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . We will not review claims absent law and analysis." (Internal quotation marks omitted.) *In re Kachainy C.*, 67 Conn. App. 401, 413, 787 A.2d 592 (2001).

stitutional dimensions . . . . The respondent's due process rights are therefore properly determined by the balancing test of *Mathews* v. *Eldridge*, 424 U.S. 319, 334, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)." (Citations omitted; internal quotation marks omitted.) *In re Juvenile Appeal, (Docket No. 10155)*, 187 Conn. 431, 435, 446 A.2d 808 (1982). That test requires us to "[consider] three distinct factors. First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (Internal quotation marks omitted.) Id., 436. "Phrased differently, we must determine if the private interest of the respondent in the companionship, love and control of her [children] is at risk of being erroneously terminated because of the lack of an adequate procedural safeguard that could be provided for her without disregarding the state's interest in the well being of the child and the fiscal and administrative burden on the state." *In re Alexander V.*, 25 Conn. App. 741, 744–45, 596 A.2d 934 (1991), aff'd, 223 Conn. 557, 613 A.2d 780 (1992).

With regard to the first prong of *Mathews*, in cases in which a termination of parental rights is at stake, our Supreme Court has stated that "[t]he parent's desire for and right to the companionship, care, custody, and management of his or her children is a fundamental interest that undeniably warrants deference and, absent a powerful countervailing interest, protection. . . . That interest is basic and private, and subject to complete destruction by the state." (Citations omitted; internal quotation marks omitted.) Id., 745. Thus, under the

first prong of *Mathews*, the respondent's interest in retaining her parental rights weighs in her favor.

The second factor of *Mathews* to consider is whether our standard of appellate review of a trial court's decision to terminate a parent's parental rights creates a risk of erroneous deprivation. The respondent argues that due process requires a higher standard of review on appeal because the "minimal procedural safeguards used at the trial level" leave significant room for error. The respondent contends that there is a significant risk that the clearly erroneous standard of review on appeal will lead to an erroneous termination of parental rights because a termination of parental rights is (1) determined by a judge without a jury, (2) at a standard less than beyond a reasonable doubt and (3) pursuant to a statutory scheme that does not require the trial court to make a finding that a less restrictive means to protect the child is unavailable before termination. She does not, however, expound on or articulate a basis for those notions. Instead, she cites some examples of jurisdictions that utilize procedural safeguards different from Connecticut's at trial and on appeal. Those examples shed no light on each jurisdiction's underlying motivation for incorporating those safeguards into their termination proceedings. Moreover, the respondent does not explain why, or how, the implementation of those formalities would offer superior safeguards to those already afforded to Connecticut parents involved in termination proceedings.

Our Supreme Court "has denounced laxity in procedural safeguards at termination proceedings . . . ." (Citation omitted; internal quotation marks omitted.) *In re Juvenile Appeal, (Docket No. 10155)*, supra, 187 Conn. 437. Moreover, the court has stated that "even when the contemplated state intrusion is most severe, as in an action for termination of parental rights, the state is required only to provide an appropriately

demanding standard of proof so as to guarantee funda-
mentally fair *procedures*." (Emphasis in original, inter-
nal quotation marks omitted.) *Lehrer* v. *Davis*, 214
Conn. 232, 238, 571 A.2d 691 (1990).

General Statutes § 45a-717 (g) designates a standard
of clear and convincing evidence for termination of
parental rights proceedings. "The function of a standard
of proof, as that concept is embodied in the Due Process
Clause and in the realm of factfinding, is to instruct
the factfinder concerning the degree of confidence our
society thinks he should have in the correctness of
factual conclusions for a particular type of adjudication.
. . . A standard of proof allocates the risk of error
between the litigants and indicates the relative impor-
tance of the ultimate decision." (Citations omitted;
internal quotation marks omitted.) *Issler* v. *Issler*, 50
Conn. App. 58, 75, 716 A.2d 938 (1998), rev'd on other
grounds, 250 Conn. 226, 737 A.2d 383 (1999). "Proof
by clear and convincing evidence is an intermediate
standard generally used in civil cases involving allega-
tions of fraud or some other quasi-criminal wrongdoing,
or when particularly important individual rights are
involved." Id. That standard "should operate as a
weighty caution upon the minds of all judges, and it
forbids relief whenever the evidence is loose, equivocal
or contradictory." (Internal quotation marks omitted.)
*Lopinto* v. *Haines*, 185 Conn. 527, 539, 441 A.2d 151
(1981). The risk of erroneous deprivation on appeal is
therefore, slight given that weighty burden at the trial
court level.

Our standard of review on appeal from a termination
of parental rights proceeding comports with the due
process rights of all parties involved. It is well settled
that our review of a court's factual determinations is
governed by the clearly erroneous standard. See *In re
Christopher L.*, 58 Conn. App. 380, 382, 752 A.2d 101
(2000). There are "two central purposes of requiring a

trial judge to file factual findings: to facilitate appellate review; and to ensure that the trial judge takes care in ascertaining the facts. It is sometimes said that the requirement that the trial judge file findings of fact is for the convenience of the upper courts. While it does serve that end, it has a far more important purpose— that of evoking care on the part of the trial judge in ascertaining the facts. For, as every judge knows, to set down in precise words the facts as he finds them is the best way to avoid carelessness in the discharge of that duty . . . . When a . . . trial judge sits without a jury, that responsibility is his. And it is not a light responsibility since, unless his findings are clearly erroneous, no upper court may disturb them. To ascertain the facts is not a mechanical act. It is a difficult art, not a science. It involves skill and judgment. As fact-finding is a human undertaking, it can, of course, never be perfect and infallible. For that very reason every effort should be made to render it as adequate as it humanly can be." (Internal quotation marks omitted.) *Grayson* v. *Grayson*, 4 Conn. App. 275, 297–98, 494 A.2d 576 (1985) (*Borden, J.*, dissenting), appeal dismissed, 202 Conn. 22, 520 A.2d 225 (1987).

Indubitably, the trial judge undertakes a difficult and careful assessment of all the facts and circumstances involved in termination cases to determine whether one or more of the four grounds for termination has been proven by clear and convincing evidence. See General Statutes § 17a-112 (j). Moreover, "[i]t is well established that the trial court is in the best position to determine the credibility of witnesses and the weight to be accorded their testimony." (Internal quotation marks omitted.) *In re Haley B.*, 81 Conn. App. 62, 66, 838 A.2d 1006 (2004). "It is futile to assign error involving the weight of testimony or the credibility of witnesses." (Internal quotation marks omitted.) *Grayson* v. *Grayson*, supra, 4 Conn. App. 293. If we were to conduct de

novo review, as the respondent urges, we would in effect second-guess the trial court's factual conclusions and substitute our judgment for the court's on the basis of our reading of the cold record. See id. That we cannot do. Instead, "[w]e must be ever mindful . . . of our limited role in such a case. . . . The question is not whether this court might have reached the same conclusion . . . but whether the trial court could not reasonably have concluded as it did." Id., 293–94. The risk of erroneous deprivation, therefore, is not increased by the use of our standard of clearly erroneous review on appeal. Thus, the second prong of *Mathews* favors the state.

The third and final factor we consider under *Mathews* "concerns the government's interest as parens patriae in the termination of parental rights." *In re Alexander V.*, supra, 25 Conn. App. 747–48. "The state's primary interest in terminating parental rights is to free the child for adoption or to free the child of uncertainty." *In re Shaquanna M.*, 61 Conn. App. 592, 608, 767 A.2d 155 (2001). "[T]he ultimate standard underlying the whole statutory scheme regulating child welfare is the best interest of the child." (Internal quotation marks omitted.) *In re Alexander V.*, supra, 748. The respondent appears to argue that the cost of the added procedural safeguard would be minimal because several other jurisdictions apply de novo review to termination cases on appeal or utilize plenary review to determine independently whether the facts found by the trial court support the termination of parental rights. We conclude, however, that given the extensive nature of the judicial resources involved throughout the termination process and the requirement that detailed factual findings amount to clear and convincing evidence in favor of termination, de novo review on appeal would involve a duplication of efforts and therefore would burden our judicial resources. The added cost is therefore signifi-

cant. Accordingly, the third prong of *Mathews* favors the state.

The balancing test of *Mathews* v. *Eldridge*, supra, 424 U.S. 319, does not support the respondent's due process claim. Although parental rights are unquestionably of constitutional magnitude, we cannot find that a risk of erroneous deprivation results from our use of the clearly erroneous standard of appellate review. In addition, the use of de novo review would be contrary to the government's interest in judicial economy. As such, we decline to modify our standard of appellate review of termination of parental rights proceedings.[6]

The judgments are affirmed.

In this opinion the other judges concurred.

---

[6] The respondent also has requested that should we decline to alter our current standard of appellate review to de novo review, we adopt either plenary review, a substantial evidence test or something more than the clearly erroneous standard to review a termination of parental rights. On the basis of the foregoing analysis, we decline to do so.