******************************************************

The "officially released" date that appears near the be-
ginning of each opinion is the date the opinion will be pub-
lished in the Connecticut Law Journal or the date it was
released as a slip opinion. The operative date for the be-
ginning of all time periods for filing postopinion motions
and petitions for certification is the "officially released"
date appearing in the opinion.

All opinions are subject to modification and technical
correction prior to official publication in the Connecticut
Reports and Connecticut Appellate Reports. In the event of
discrepancies between the advance release version of an
opinion and the latest version appearing in the Connecticut
Law Journal and subsequently in the Connecticut Reports
or Connecticut Appellate Reports, the latest version is to
be considered authoritative.

The syllabus and procedural history accompanying the
opinion as it appears in the Connecticut Law Journal and
bound volumes of official reports are copyrighted by the
Secretary of the State, State of Connecticut, and may not
be reproduced and distributed without the express written
permission of the Commission on Official Legal Publica-
tions, Judicial Branch, State of Connecticut.

******************************************************

IN RE LUIS N. ET AL.*
(AC 39934)

Lavine, Prescott and Harper, Js.

*Syllabus*

The respondent father appealed to this court from the judgments of the
trial court terminating his parental rights with respect to his two minor
children. In response to a motion filed by the father seeking to have
the children, who were six and seven years old at the time, testify at
the termination trial, the court ruled that, in lieu of testimony, it would
invite the children to the courthouse so that they would have an opportu-
nity to get to know the court and observe the courtroom, and to under-
stand that the court would be deciding the case, and all counsel agreed
to the procedure outlined by the court for the meeting. The court made
no inquiry of the children during the visit, during which one of the
children spontaneously stated that she would be willing to stay with
her foster mother or go back to her parents, and during which the
children's guardian ad litem and a visitation supervisor for the Depart-
ment of Children and Families were present. Following the meeting,
the court stated on the record what had transpired, and it had the
guardian ad litem make a statement regarding comments of the children
during the meeting. *Held*:

1. The respondent father could not prevail on his unpreserved claim that
   the trial court deprived him of a fair trial by meeting with the children
   ex parte, allowing a department visitation supervisor to attend the meet-
   ing, and failing to make a record of its observations of the children:
   although the record was adequate for review, and the claim was of
   constitutional magnitude and reviewable under *State* v. *Golding* (213
   Conn. 233), even if the trial court's ex parte meeting violated the father's
   right to a fair trial, any error was harmless, as the father did not challenge
   the court's statutory findings, in support of the termination judgments,
   concerning the reasonable efforts to reunify the father with his children,
   the fact that he was unable and unwilling to benefit from reunification
   efforts, his failure to achieve a sufficient degree of personal rehabilitation
   as required by statute, and the best interests of the children; moreover,
   although the father did not have the opportunity to cross-examine the
   children and the department visitation supervisor, the court stated on the
   record immediately after meeting with the children what had transpired
   during the meeting and inquired of the father and others whether they
   wanted further explanation, which was declined by counsel, and the
   court instructed the guardian ad litem to report what had transpired at
   the meeting, including the spontaneous comment made by one of the
   children that was repeated by the department visitation supervisor;
   furthermore, the father could not prevail under the plain error doctrine
   given his failure to challenge the factual basis of the judgments terminat-
   ing his parental rights, and to reverse the judgments under these circum-
   stances could undermine public confidence in the integrity of the
   judicial system.

2. The respondent father could not prevail on his claim that the trial court
   erred in failing to declare a mistrial, sua sponte, after it held an ex parte
   meeting with the children in the presence of the department visitation
   supervisor and allegedly drew evidentiary conclusions from its observa-
   tion of the children; the father was aware of and agreed to the court's
   ex parte meeting with the children, there was nothing in the record to
   support the appearance of impartiality or bias on the part of the trial
   court due to the presence of the department visitation supervisor, and,
   because the father's counsel did not object or ask the court to recuse
   itself or to declare a mistrial when the court informed the parties about
   the supervisor's presence, the father could not now raise a claim that
   was not raised before the trial court.

Argued May 31—officially released July 27, 2017**

*Procedural History*

Amended petitions by the Commissioner of Children and Families to terminate the respondents' parental rights as to their minor children, brought to the Superior Court in the judicial district of Middlesex, Child Protection Session at Middletown, where the court, *Rubinow*, *J.*, denied the respondents' motion to present child testimony; thereafter, the matter was tried to the court; judgments terminating the respondents' parental rights, from which the respondent father appealed to this court. *Affirmed.*

*Albert J. Oneto IV*, assigned counsel, for the appellant (respondent father).

*Frank H. LaMonaca*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*Opinion*

LAVINE, J. The respondent father, S.N., appeals from the judgments of the trial court terminating his parental rights in his son, L.N., and his daughter, M.N.[1] On appeal, the respondent claims that the judgments should be reversed because the court met with the children ex parte in the presence of a Department of Children and Families visitation supervisor, failed to make a record of its observations regarding the children, and failed to declare a mistrial. We affirm the judgments of the trial court.

I

A

The Termination Facts

In a 120 page memorandum of decision, the trial court, *Rubinow, J.*, made the following findings of fact that are relevant to the termination of parental rights petitions at issue in the present appeal. L.N. was born in July, 2008, and M.N. was born in June, 2009. They came to the attention of the Department of Children and Families (department), in February, 2011, when they were in the custody of their mother, B.F.,[2] who was overwhelmed by caring for them. The children remained in her custody until October 11, 2011, when the department removed them pursuant to General Statutes § 17a-101g. On October 21, 2011, the court, *Hon. William L. Wollenberg*, judge trial referee, sustained the orders of temporary custody in the petitioner, the Commissioner of Children and Families, and ordered specific steps for the respondent to aid in his reunification with the children.

On August 9, 2012, the court, *Frazzini, J.*, adjudicated the children neglected as to the respondent on the ground that they were exposed to conditions injurious to their well-being.[3] Judge Frazzini ordered the children committed to the custody of the petitioner and issued new specific steps for the respondent to facilitate reunification. See General Statutes § 46b-129. On December 12, 2012, the petitioner filed petitions to terminate the respondent's parental rights in the children. In her amended petitions, the petitioner alleged that the department had made reasonable efforts to locate the respondent and to reunify him with the children, that the respondent was unable or unwilling to benefit from reasonable reunification efforts, that he had failed to achieve personal rehabilitation, and that termination of his parental rights in the children was in their best interests. The trial on the termination petitions was held on approximately sixteen days between November 24, 2014, and August 3, 2016. Judge Rubinow issued a memorandum of decision in which the respondent's parental rights in the children were terminated on November 15, 2016. The court, *Olear, J.*, granted the respondent's application for the appointment of appel-

late counsel and the waiver of fees. The respondent appealed.

Judge Rubinow made extensive findings of fact with regard to the respondent, which we summarize for the purposes of the present appeal. The respondent was born in 1981 and was graduated from high school. In 2011, he was employed at a car wash. The respondent had relatively simultaneous relationships with several women that resulted in the births of eight children, some of whom are only a few months apart in age.[4] He is married to T.F., the mother of two of his children: S.N., Jr. (S Jr.) and Y.[5]

The court found that department personnel met with the respondent on numerous occasions, beginning in February, 2011,[6] when the children were in B.F.'s custody. He agreed to work with the department and take care of the children on some weekends as a way of helping B.F. The department made in-home family preservation services available to the respondent from February through October, 2011, but he never availed himself of the services. In October, 2011, when the children were removed from B.F.'s custody, the respondent proposed that the children move into his parents' home. The department deemed the respondent's plan inappropriate; it involved too many people sharing too few bedrooms.[7]

Starting in October, 2011, the department provided the respondent with once a week, two hour supervised visits with the children. The department also provided him with behavioral health services to help him comply with his specific steps, in addition to a one-on-one fatherhood education program adjusted to meet his cognitive and reading limitations.[8] In June, 2012, Bruce Freedman, a licensed psychologist, conducted a court-ordered psychological evaluation of the respondent, which included an observation of the respondent's interaction with the children.

The petitioner filed petitions to terminate the respondent's rights in both of the children on December 12, 2012. In November, 2013, the department decided not to pursue the termination petitions due to the positive feedback it had received from the agencies and individuals who were providing services to the respondent. Instead, the department planned to reunify the respondent with the children by February 10, 2014.[9] The department, therefore, increased the amount of supervised visitation the respondent had with the children with a goal of ending supervision. At the time, L.N. was five years old and M.N. was four.

Prior to the planned reunification, the respondent was living in a two bedroom apartment with C, his oldest daughter. He planned to sleep in the living room while C and M.N. slept in one of the bedrooms, and L.N. slept in the other bedroom. Although the respon-

dent and T.F. are married, they live apart during the week and spend weekends together along with C, S Jr., Y, and other children for whom T.F. was responsible. Although the respondent wanted his children to live full time in the same household with T.F.'s children, he never obtained an apartment large enough to accommodate them all. Freedman conducted another court-ordered psychological evaluation, which again included an observation of the respondent's interaction with L.N. and M.N.

The department's reunification plan for the respondent was disrupted, however. In 2011, the respondent had secured employment as a school van driver. On December 10, 2013, the department received a complaint regarding the respondent's conduct while he was working as a school van driver. The department investigated and found that a seventh grader and a tenth grader had reported observing the respondent as he watched inappropriate images on his phone while the van was stopped. When the respondent noticed that the students were watching him, he "pulled his phone away." The respondent denied that he was "looking at porn," but admitted that he frequently looked at pictures of women in lingerie.[10] Despite this incident, the department continued its reunification plan for the respondent.

The court found that the reunification plan was interrupted again on February 7, 2014, when M.N. disclosed that her half brother S Jr., who was six years old at the time, had sexually molested her. B.F. and M.N.'s foster mother both reported the alleged abuse to the department. The alleged abuse occurred in the respondent's apartment when he left M.N. and S Jr. unattended while he was in the bathroom, possibly showering. The court found that M.N. credibly had reported the details of the sexual abuse during therapy. S Jr. had sexually touched M.N.'s genitals, exposed his own genitals, and stated to M.N. that he wanted to "plug her" and have sex with her. The respondent was aware of M.N.'s accusations and discussed the matter with S Jr. Following the conversation, the respondent did not believe that S Jr. had committed the alleged sexual abuse or that he had made sexually suggestive comments to M.N.[11] The department personnel debated whether the respondent should be reunited with the children or the termination petitions should be pursued. In the fall of 2014, notwithstanding the parenting education and individual coaching that the respondent had received, the respondent lacked a concrete, viable plan to keep M.N. safe when she was visiting with any of his other children, including S Jr. In view of the circumstances, the department elected to forgo reunification and to proceed with the termination of parental rights petitions that had been filed in 2012.

In its memorandum of decision, the court set forth the elements of General Statutes § 17a-112 (j),[12] which

the petitioner was required to prove by clear and convincing evidence in order to prevail on her petitions. The court found that the department had made reasonable efforts to maintain consistent contact with the respondent and had made reasonable reunification efforts for the respondent during the adjudicatory period[13] and that the respondent was unable or unwilling to benefit from reunification efforts as contemplated by § 17a-112 (j) (1).[14]

The court further found by clear and convincing evidence that the respondent had failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the ages and specialized needs of the children, he could assume a responsible position in their lives. The court made specific findings of fact related to the statutory requirements.

In 2012, Freedman found that the respondent had significant difficulty interacting with L.N. and M.N., but by late 2013, the respondent's parenting techniques had improved considerably. The respondent, however, still showed some social avoidance, shyness, and insecurity in his reading skills. Freedman was more concerned, however, that the respondent had fathered many children, some of whom were exactly the same age, and the respondent did not know their birth dates. He also did not know the name of the school C attended. Freedman had serious concerns about the respondent's ability to supervise and emotionally support his progeny, especially if the respondent's dream of blending his families came to fruition.

Despite all of the parent education services that the respondent had received, the court found that he did not appreciate the problems he faced supporting eight children and finding time to spend with each of them. He had failed to achieve any meaningful degree of insight into L.N.'s and M.N.'s specialized needs. Without such insight, the respondent did not have the ability to prevent M.N. from again being exposed to S Jr.'s sexual behavior, to manage the sibling rivalry attendant to the long-term reunification of L.N. and M.N. with the respondent's other children and to manage the additional stress presented by T.F.'s need to care for her young twins.

To further support its conclusion that the respondent had failed to achieve the requisite degree of rehabilitation required by § 17a-112 (j) (3) (B) (i), the court examined the nature and extent of the respondent's compliance with the specific steps ordered for him under § 46b-129. In general, the court found that the respondent had only facially complied with a number of the steps. His mere attendance at educational programs and his cooperation with service providers did not support the conclusion that he had achieved any degree of personal rehabilitation that encouraged the belief

that, within a reasonable time, considering the ages of the children and their special needs, he could assume a responsible position in their lives.[15] Although the respondent cooperated with the department, he had failed to make measurable progress toward the fundamental treatment goal of being able to provide a safe and nurturing environment for the children. The court concluded that the petitioner had met her burden of proving by clear and convincing evidence that the respondent had failed to achieve rehabilitation within the meaning of a § 17a-112 (j) (3) (B) (i).

The trial court also made the following findings, as required by § 17a-112 (k). The reunification services the department provided to the respondent and the children were timely and appropriate.[16] The respondent, however, was not able to improve his ability to serve as a safe, effective parent to the children pursuant to the specific steps ordered for him. L.N. was three years old and M.N. was two at the time the order of temporary custody entered; L.N. was eight years old and M.N. was seven at the time the respondent's parental rights in them were terminated.

The court found that the children are bonded to one another and know that the respondent is their biological father, even though they have lived in foster care since October, 2011. The children have no memory of their time with the respondent prior to the time they were removed from B.F.'s care; their memories of the respondent derive from their supervised visits with him. The children are bonded to the respondent and have a positive relationship with T.F. Although the children enjoy the time they spend with the respondent, they do not look to him for emotional support.

The children were placed with their foster mother, M.F., in October, 2011, and they have close emotional ties to her. They also are bonded to M.F.'s two biological children and her domestic partner, H.B., on whom they rely. H.B. works as a public safety officer and his schedule permits him to transport the children to services when M.F. is working as a certified medical technician.

The court found that although the respondent has limited financial resources, his economic circumstances have not prevented him from maintaining a meaningful relationship with the children. He also was not "prevented from maintaining a meaningful relationship with the [children] by the unreasonable act or conduct of the other parent of the [children], or the unreasonable act of any other person . . . ." General Statutes § 17a-112 (k) (7). The respondent has benefitted from subsidized housing services. Despite his criminal history, the respondent has held lawful employment, but he lost his position as a school van driver because he was looking at inappropriate material on his phone in the presence of schoolchildren. The court found that that misconduct was inconsistent with the role of an

adult responsible for the safe transportation of other people's children. The respondent's decisions about his personal life and his inability or unwillingness to benefit from reunification efforts, not economic factors, impeded his ability to develop a meaningful relationship with the children.

The court responded to the respondent's argument that M.F. had impeded his relationship with the children due to her unwillingness or inability to attend various counseling sessions or to provide the children with consistent attendance at counseling. The court did not condone M.F.'s inconsistency in transporting the children to counseling, but it found that her conduct did not prevent the respondent from maintaining a meaningful relationship with them. According to Sam Christodlous, the children's guardian ad litem, M.F. made efforts to involve the respondent in activities for the children, such as birthday parties, but he did not regularly accept her invitations.

In addressing the best interests of the children, the court considered the children's particular specialized needs in the context of the respondent's response to reunification efforts and his failure to achieve a degree of personal rehabilitation sufficient to encourage the belief that he could assume a responsible position in the life of the children within a reasonable time. The court fully credited Christodlous' opinion that was founded on what the court described as his thorough, detailed, careful, compassionate, yet objective, investigation of the children's and their parents' circumstances. The clear and convincing evidence, the court found, established that the respondent has not reached the point where, on a daily basis, he could meet the best interests of either of the children. The court, therefore, concluded that it was in the best interests of the children that the respondent's parental rights in them be terminated. The respondent's application for the appointment of counsel and the waiver of fees to appeal was granted.

## B

### The Facts Regarding the Appeal

The respondent appealed and raises two interrelated claims concerning an ex parte meeting the court had with the children. The following facts are related to the respondent's claims. In January, 2016, the respondent and B.F. expressed an interest in having the children testify at the termination of parental rights trial, but they wished to protect the children from cross-examination. On January 14, 2016, the respondent and B.F. filed a joint motion requesting permission for the children to testify pursuant to Practice Book § 32a-4 (b).[17] The motion argued that the children, ages six and seven at that time, were parties to the termination proceedings and should be permitted to testify on their own behalf.

The motion represented that the children had expressed to the respondent and to B.F., during their respective visits, a desire to live with them. The respondent and B.F. argued that the children's testimony was crucial in determining the best interests of the children and therefore was relevant. Before the court ruled on the motion for the children to testify, on January 15, 2016, Alina Bricklin-Goldstein, the children's attorney, filed a motion for the appointment of a guardian ad litem for the children. Counsel for the petitioner, the respondent, and B.F. did not object. The court granted the motion and appointed Christodlous.

The joint motion for the children to testify came before the court on March 18, 2016. The court described the children as "very young," and, in lieu of testimony, the court offered to invite the children to come to court to see what goes on; to observe the physical structure of the courtroom; to meet the court reporter, the marshal, the clerk and the judge; and to sit on the bench. The court represented that it would take no testimony from the children, as the court had concluded that it was not in the best interests of the children to put them in a position where they were either subject to cross-examination or where they could draw the conclusion that something that they had stated would lead to an outcome. Although the children may have opinions and a desired outcome, the court stated that the children's opinions and desires could be represented by Bricklin-Goldstein. The court had not yet reached a conclusion regarding the outcome of the proceedings, but it understood that, from time to time, the children wished to live with the respondent when they are with him and with B.F. when they are with her.

The court asked Christodlous whether he knew the children well enough to have an opinion as to whether they would benefit from an opportunity to visit the court. Christodlous stated that he thought that he knew the children well enough to offer an opinion, to wit: "I think because the children so much want to see what happens in this court, I don't think they should necessarily be here during the hearing, but I do think [it would] be very beneficial for them to come in, see the courtroom, meet Your Honor, too. . . . [T]hey understand through their lawyer that Your Honor makes the decision, no one else does." He also opined that it would be beneficial for the children if both he and Bricklin-Goldstein were present, but that the respondent and B.F. should not be present. The following colloquy then transpired.

"The Court: If the court inquired of the children only as to whether they had any questions for the court, do you think that would suffice in franchising them with regard to this process without infringing upon what should be, at their ages and stages of development, as innocent as is practicable, a perception of reality?

"Attorney Christodlous: I think so. I can't give a 100 percent answer on that, but I think so. Yes, Your Honor.

"The Court: Do you know of any therapeutic basis [for] why either child should not be allowed to come into the courtroom and see what's going on here?

"Attorney Christodlous: I do not, and I personally believe it would be beneficial for them to be here."

Bricklin-Goldstein stated that coming to the courtroom would be a great experience for the children. Counsel for the respondent and F.B. stated that their clients were satisfied with the procedure that the court outlined. The court inquired of the assistant attorney general, Frank H. LaMonaca, whether the department could bring the children to court at 9 a.m., on April 27, 2016. LaMonaca suggested that the foster mother could bring the children to court. The court declined to permit the foster mother to bring the children to court.

The court ordered the department to produce the children at the courthouse on April 27, 2016, and to take them to the juvenile clerk's office, where they could be brought to the courtroom by the clerk with the assistance of Bricklin-Goldstein and Christodlous. The court would be present at 9 a.m. on that date. The court further stated that it is "the court's expectation that the children will . . . not be subject to a record process; this is not an opportunity for them to give testimony. If they do have a question for the court, Mr. Christodlous will be here, and I hope you will accept his explication [of] and response [to] what it is they asked, or what it is they had to say. In the event that they should create any drawings, as sometimes happens when kids are in court and are faced with a great big desk like this and see pens and paper on it, the court will of course save them and make them available to counsel. But, I do not expect to obtain any testimony. They won't be subject to cross-examination. So, even if they should say something, they won't be under oath, and it will not be evidence. Is that satisfactory?"[18] All counsel agreed to the procedure outlined by the court.[19]

After the court met with the children on April 27, 2016, it placed the following statement on the record. "Counsel, before court commenced today in resolution of the motions for child testimony that had been filed, the court had made arrangements to meet with the children so they would have the opportunity, as you all had agreed, to get to know the court, to understand that the court and the court alone would be making the decision in this case, and to observe the facilities, particularly the courtroom in which the case has been ongoing for so many years.

"This court had the opportunity to observe the children interacting with court staff at the child protection clerk's office. This court had the opportunity to observe the children interacting with court staff and with [the

department] visitation supervisor, who was present at the request, I understand, of the children's counsel and their guardian ad litem during this process. Several spontaneous comments were made by the children, by [L.N.], in particular. I will repeat them only if you request, but before I do so, there was in the presence of the court, but not on the record, and the marshal was also present, and the marshal trainee was also present, as was the clerk. I believe the monitor was still in the room as well.

"There was an inquiry of the children related to the children's desired outcome in these proceedings presented by an individual, notwithstanding any orders that had been issued by the court previously to enhance the court's opportunity to see the children in as neutral a setting as possible, and the goal, again, was to enhance the children's understanding that the court and the court alone would be making decisions in the case. I believe that . . . Christodlous could summarize that which occurred. I don't attribute any intent on any party.

\* \* \*

"Attorney Christodlous: The children made some statements which the [department] visitation supervisor did not believe Your Honor heard and repeated . . . the statements directly to Your Honor. He felt—he was thinking he was assisting, did not intend any harm, but he did repeat the statements, which the children had made, and I do not know whether Your Honor had heard the statements initially made by the children, but he repeated [them], and I'm quite clear Your Honor heard what he said . . . because Your Honor indicated to him that you did not want to hear from him.

"The Court: The court did hear all of the comments that were made by the children in the courtroom. Their visit in this courtroom was directed at achieving the one goal I identified, so that they would see the courtroom, have the opportunity to observe the facilities, and understand the environment in which the case is being tried. This court made no inquiry of the children as to what they desire. To the extent the Court now has had the opportunity to observe the children, if that is not a part—their behavior and their demeanor is not a part of the report by the guardian ad litem at the appropriate time during the case, and I rather expect it will be, I will bring to your attention then that which I observed. I can do that now if you'd like, but my goal was not to acquire evidence for use in the case. That's what . . . Christodlous' presence at the visit to the courtroom was for, so he can be cross-examined.

"It is not that the court attributes no value to what the children said, the court does not know enough about these children to place their comments in any context one way or another. There have been sufficient concerns raised throughout the course of the evidence con-

cerning the status of the children, and supported by the court's observations of their behavior and demeanor today, both in the child protection clerk's office and in the courtroom."

The court directed Christodlous to consider and investigate the children's best interests and to inform the court of his opinion regarding the nature, type, and scope of a placement environment to address the best interests of each child in sustained growth, development, well-being, continuity, stability, and conduct as they grow into their preteen and teenage years, that will most likely lead to their success in the community. Christodlous agreed to do so. The court asked whether anyone needed to hear further from the court regarding its observations of the children. All counsel responded in the negative.

On August 3, 2016, Christodlous testified, in relevant part, as follows. "I . . . met with the children on six separate occasions. I met with them at both parents' homes, at the foster parent's home, the school, and of course, here in the court. I have had an opportunity to sit down and talk to the children as well as [department personnel] and the child's attorney. I've also discussed this matter with all the attorneys involved in this matter. I have reviewed all the records that were the exhibits . . . in the court file. And again, I did read all the transcripts and prepare that way. I listened to testimony while here on the case since I was appointed, and I had questions which were asked on my behalf by other parties in this matter when they came up. . . .

"The only time the children were in the courtroom, one of the children actually changed what she had said earlier to her attorney in my presence. And what she had said the last time we were here was that she would be willing to stay with her foster mom or go back to her parents. I did take that as a sign that she has become quite comfortable at her foster parent's [home], which supports what I saw when I was there." On cross-examination by B.F.'s counsel, Christodlous testified that M.N. once had expressed that she wished to live with B.F., but she also stated that she would be happy to stay with her foster mother. M.N.'s statement about staying with her foster mother was made when she was in the courthouse.

On January 10, 2017, the respondent filed a motion for articulation and rectification in which he asked Judge Rubinow to articulate the legal basis of her March 18, 2016 order directing the department to produce the children at the courthouse to meet the judicial authority, but not for them to give testimony, be cross-examined or for any evidentiary purpose, so that they may be exposed to the architectural ambience of the courthouse and the courtroom, among other things. The respondent also moved that the court rectify the record to set forth the details of its April 27, 2016 encounter

with the children during which the court had the "opportunity to observe the children interacting with court staff . . . and with the [department] visitation supervisor" and hear several spontaneous comments the children made about their desired outcome of the proceedings. The petitioner objected to the motion for articulation and rectification.

In responding to the respondent's motion for articulation and rectification, on February 23, 2017, Judge Olear noted that Judge Rubinow had retired from the bench on November 16, 2016, and that "[n]o party to the proceeding has asked that the *trial court* conduct a hearing on the pending motions, and the court declines to do so sua sponte, as the court has determined that holding a hearing would not provide any information that would suffice to permit the court to respond to the motions for articulation and rectification." (Emphasis in original.) Judge Olear denied the motion for articulation and rectification.[20] The respondent appealed.

First, we set forth "the well established legal framework for deciding termination of parental rights petitions. [A] hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (3)] exists by clear and convincing evidence. . . . If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Elijah G.-R.*, 167 Conn. App. 1, 18–19, 142 A.3d 482 (2016).

## II

The respondent's first claim on appeal is that the court deprived him of a fair trial when it violated the parties' agreement permitting the court to meet with the children ex parte by allowing a department visitation supervisor to attend the meeting and by failing to make a record of its observations of the children. The respondent did not preserve this claim at trial and on appeal seeks (1) review and reversal pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), as modified in *In re Yasiel R.*, 317 Conn. 733, 781, 120 A.3d 1188 (2015), or, in the alternative, (2) reversal pursuant to the plain error doctrine. Even if we assume without deciding that the court violated the respondent's rights, we are persuaded that any error was harmless. The respondent, therefore, cannot prevail under *Golding* or the plain error doctrine.

### A

#### *Golding* Review

The respondent claims that the court violated his

constitutional right to a fair trial by meeting with the children ex parte in the company of a department visitation supervisor and by failing to make a record of its observations of the children. He seeks to reverse the judgments terminating his parental rights in the children pursuant to *Golding*. Even if we assume, without deciding, that the respondent's rights were violated, the petitioner has persuaded us that any error was harmless.

"[A respondent] can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the clam is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the [respondent] of a fair trial; and (4) if subject to harmless error analysis, the [petitioner] has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40.

We will review the respondent's claim because the record is adequate for review and the claim is of constitutional magnitude.[21] See *In re Tayler F.*, 296 Conn. 524, 553, 995 A.2d 611 (2010) (right to confrontation and cross-examination in civil action is grounded in due process clauses of fifth and fourteenth amendments). Although the respondent did not have the opportunity to cross-examine the children and the department visitation supervisor, immediately after meeting with the children, the court stated on the record what had transpired during the meeting and inquired of the respondent and others whether they wished further explanation.[22] All counsel declined further explanation by the court. Moreover, the court instructed Christodlous to report what transpired at the meeting, including the spontaneous comment made by one of the children that was repeated by the department visitation supervisor.

The respondent cannot prevail on appeal because he has not challenged any facts found by the court that support its judgments terminating the respondent's parental rights in the children. More specifically, the respondent does not challenge the court's findings, required by the statute, that the department made reasonable efforts to reunify him with the children; that he was unable and unwilling to benefit from reunification efforts; that he failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the children, he could assume a responsible position in their lives; or that it was in the best interests of the children to terminate his parental rights in them.

"In many cases of an alleged constitutional violation . . . the [petitioner] is able to demonstrate the harmlessness of such alleged violations beyond a reasonable

doubt. . . . Under such circumstances, it would be a waste of judicial resources, and a pedantic exercise, to delve deeply into the constitutional merits of a claim that can appropriately be resolved in accordance with the relevant harmless error analysis." (Citations omitted.) *State* v. *Golding*, supra, 213 Conn. 241–42.

In this case, it was the children's concerns that the court sought to allay by inviting them to come into the courtroom. This case illustrates, however, the danger inherent in any case in the court's meeting with children outside the presence of counsel for the parties. No matter how good the intentions of the court may be and how controlled such a meeting may be, there is always a possibility that something may go wrong. In the present case, the petitioner has demonstrated beyond a reasonable doubt that the constitutional error, if any, was harmless. Thus, the respondent's claim fails to satisfy the fourth prong of *Golding*. We conclude, therefore, that reversal of the termination judgments is not warranted.

B

Plain Error

The respondent also seeks reversal of the judgments terminating his parent rights in the children pursuant to the plain error doctrine. For the same reason that he cannot prevail under *Golding*, i.e., he failed to challenge the court's factual findings, the respondent cannot prevail under the plain error doctrine.

"[The plain error] doctrine, codified at Practice Book § 60-5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . Implicit in this very demanding standard is the notion . . . that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review. . . . [Thus, an appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice. . . .

"[Our Supreme Court has] clarified the two step framework under which we review claims of plain error. First, we must determine whether the trial court in fact committed an error and, if it did, whether that error was indeed plain in the sense that it is patent [or] readily discernible on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . [T]his inquiry entails a relatively high standard, under which it is not enough for the [respondent] simply to demonstrate that his position is correct. Rather, [to prevail] the party [claiming] plain error [reversal] must demonstrate that the claimed impropriety was so clear, obvious and indisputable as to warrant the extraordinary remedy of reversal. . . .

"In addition, although a clear and obvious mistake on the part of the trial court is a prerequisite for reversal under the plain error doctrine, such a finding is not, without more, sufficient to warrant the application of the doctrine. Because [a] party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice . . . under the second prong of the analysis we must determine whether the consequences of the error are so grievous as to be fundamentally unfair or manifestly unjust. . . . Only if both prongs of the analysis are satisfied can the appealing party obtain relief." (Internal quotation marks omitted.) *In re Sydnei V.*, 168 Conn. App. 538, 562–64, 147 A.3d 147, cert. denied, 324 Conn. 903, 151 A.3d 1289 (2016). The respondent failed to identify the harm that would undermine the public's confidence in the outcome.

For the same reasons articulated in part II A of this opinion, we decline to reverse the judgments of the trial court on the ground of plain error. If there is no *Golding* violation, ipso facto, there can be no plain error. Given the unchallenged factual basis of the termination of the respondent's parental rights in the children, to reverse the judgments, we believe, might in and of itself undermine the public's confidence in the integrity of our judicial system. For the foregoing reasons, we will not reverse the termination of parental rights judgments pursuant to the plain error doctrine.

### III

The respondent's second claim on appeal is that it was error for the trial court not to declare a mistrial, sua sponte, after it revealed that it had met the children in the company of a department visitation supervisor and that it allegedly had drawn evidentiary conclusions from its observations of the children. We disagree.

In making this claim, the respondent argues that the presence of the department visitation supervisor at the meeting with the children created the appearance of impropriety that required the court to recuse itself pursuant to rule 2.11 (a) of the Code of Judicial Conduct.[23]

In essence, the respondent relies on his plain error argument, which we addressed in part II B of this opinion. In other words, the court's meeting with the children in the presence of the department visitation supervisor constituted plain error and, therefore, an appearance of impropriety.[24]

To support his claim the respondent relies on two cases that are factually distinct. Our Supreme Court reversed the judgment of dissolution in *Cameron* v. *Cameron*, 187 Conn. 163, 444 A.2d 915 (1982). In that case, the trial court stated on the record several times, before the defendant husband took the witness stand, that the defendant or his counsel had deliberately falsified a financial affidavit. See id., 170. Our Supreme Court found that those "expressions of a preconceived view of the credibility of a witness who had not yet testified before the trier . . . must have been devastating to the defendant and astounding to any observer schooled in the simple faith that the court is an instrument of justice." Id. In remanding the case for a new trial, the court stated that proof of actual bias is not necessary where the appearance of impartiality is lacking. Id. There is nothing in the record to support even the appearance of impartiality or bias on the part of the court in the present case. Throughout the trial, especially when negotiating how to address the children's desire to understand the termination proceeding, the court repeatedly stated that it had not come to any conclusions. Moreover, the court went out of its way early in the proceedings to make known to the parties that the court suffers from asthma, as do the children, and that the court's daughter was a patient of a physician who also treated one of the children. At no time did the respondent ask the court to recuse itself.

The respondent also compares the trial court to the trial judge in *Abington Ltd. Partnership* v. *Heublein*, 246 Conn. 815, 717 A.2d 1232 (1998). That case concerned easement rights. Id., 817. The judge in that case viewed the subject property in the presence of the parties and their counsel. Id., 821. Unbeknownst to the parties and counsel, the court secretly returned to the site and engaged an adjoining property owner in a discussion of the property that was the subject of the litigation. Id. That fact came to light when the adjoining property owner was called as a witness and disclosed his conversation with the judge. Id. The plaintiff filed a motion for the judge to disqualify himself and for a mistrial, thereby preserving its claim for appeal. Id. The judge denied the motion, claiming that his ex parte visit did not cause him to be prejudiced about the merits of the litigation, and later rendered judgment on behalf of the defendants. Id., 822, 824. On appeal, our Supreme Court reversed the judgment on the ground that the judge's ex parte visit to the property created the appearance of impropriety that required the judge to recuse himself pursuant to canon 3 (c) (1) (now rule 2.11 [a])

of the Code of Judicial Conduct. Id., 825–26. Conversely, the record in the present case contains nothing to indicate that the court's actions approached the surreptitious behavior of the judge in the *Abington Ltd. Partnership* case.

In the present case, the respondent knew that the court was to meet ex parte with the children, and agreed to it. When trial resumed, the court immediately informed the parties that the department visitation supervisor was present during its meeting with the children and that the supervisor repeated a comment made by one of the children. The respondent was represented by counsel, who did not object, and did not ask the court to recuse itself or declare a mistrial. A litigant cannot pursue one course of action at trial and seek to have the judgment reversed when the outcome is adverse. See *Ingels* v. *Saldana*, 103 Conn. App. 724, 730, 930 A.2d 774 (2007). To permit a party to raise a claim on appeal that was not raised at trial is unfair to the opposing parties and the trial court. Appellate courts do not sanction ambuscade of the trial court. See *Nweeia* v. *Nweeia*, 142 Conn. App. 613, 618, 64 A.3d 1251 (2013). For the foregoing reasons, the court did not err in failing to declare, sua sponte, a mistrial.

The judgments are affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** July 27, 2017, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The court also terminated the parental rights of the children's mother, B.F. She filed a separate appeal to challenge the termination of her parental rights in the children. See *In re Luis N.*, 175 Conn. App.    ,    A.3d    (2017).

[2] The respondent and B.F. did not live together.

[3] On May 31, 2012, Judge Frazzini adjudicated the children neglected as to B.F. The petitioner filed petitions to terminate the parental rights of B.F. in the children on December 12, 2012. The termination petitions as to both the respondent and B.F. were consolidated for trial.

[4] Only L.N. and M.N. are the subject of the present appeal.

[5] T.F. also has other children.

[6] At the time, the respondent had custody of his oldest child, C, who lived with him, a female companion, his sister and his parents. The other adults in the household took care of C before and after her school day while the respondent was at work.

[7] The department also was concerned about the ability of the respondent's mother, who suffers from Parkinson's disease and requires in-home health assistance, to care for L.N., M.N., and the other children who lived there.

[8] Gregory Davis, the mentor assigned to help the respondent, modified all aspects of the advanced parenting curriculum to meet the respondent's needs.

[9] Although the children were to be reunified with the respondent, the department planned for the children to remain in the custody of the petitioner.

[10] The court found that the respondent was transferred to a different route following the incident in which students observed him viewing inappropriate material on his phone. In 2016, the respondent lost his employment as a school van driver. He returned to work at the car wash.

[11] The department referred M.N. for therapy at a child abuse treatment

center. S Jr. also was placed in therapy.

[12] General Statutes § 17a-112 (j) provides in relevant part: "(1) the Department . . . has made reasonable efforts to locate the parent and to reunify the child with the parent . . . unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . . (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court . . . to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent . . . and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

[13] The court found that the department's reunification efforts for the respondent were reasonable in view of his status as the father of many young children, including S Jr., who allegedly sexually abused M.N., and the respondent's cognitive challenges.

[14] The court found that the respondent was unable or unwilling (1) to participate in in-home family preservation services by asserting that his work schedule prevented him from doing so, (2) to comply with instructions that the children could not eat certain foods given their allergies, (3) to benefit from all of the one-on-one mentoring services regarding individual father related, impulse control, and parent behavior monitoring services provided that was clearly and convincingly apparent by his using a phone to view inappropriate images on a school van, (4) to follow the department's reasonable instructions that there could be no "accumulated family" overnight visitation at his residence, (5) to perform without full support the basic management tasks required of a parent, (6) to manage fundamental parental obligations of household management or managing a blended family, (7) to acquire the reading skills needed to complete school forms for L.N., and (8) to develop a safety plan for M.N. The court also found that when the respondent testified in April, 2016, he was unwilling or unable to recall any particular content of the therapeutic services offered by Klingberg Family Centers two years earlier, and he did not believe that S Jr., had behaved inappropriately with M.N.

[15] The court made the following findings with respect to the children. Both of the children suffer from eczema, which is exacerbated by eating certain foods. They both also have chronic asthma.

During his first days in foster care, L.N. had tantrums and engaged in sexualized behaviors with M.N. Because he was not toilet trained, L.N.'s entry into day care was delayed until he was three and one-half years old. In addition to his sexualized behavior, L.N. exhibited other signs of having been traumatized, e.g., smearing feces and urinating on himself. He had difficulty in school and in his foster home, had tantrums and cried in ways that were inappropriate for a five and one-half year old. He was defiant and oppositional. In June, 2014, L.N. was evaluated at the Klingberg Family Centers because his oppositional and defiant behaviors had continued, among other inappropriate behavior, in his after-school program and foster home. He was diagnosed with generalized anxiety disorder, symptoms of hyperactivity, sleep problems, fears, and inability to concentrate. He received therapy and gradually was able to sit still for longer periods in school. He failed to make academic progress, however, and given his specialized behavior needs, the department arranged for his school to conduct a planning and placement team meeting, which led to the implementation of special education services for him.

M.N. has special emotional needs due to her history of sexual trauma. She received therapy at Klingberg Family Centers, where she exhibited fear; physical and verbal aggression toward others; difficulty with fine motor skills, sitting still, paying attention and concentrating; and learning challenges. M.N. also intentionally urinated on herself at school, which is consistent with sexual trauma, to obtain the attention of the school nurse. She was diagnosed as a child victim of sexual abuse. She received therapy and was taught relaxation skills appropriate to her age. Despite improvement over the years, M.N. had a very difficult time in school. She struggled to stay on task, and was removed from class due to her behavioral issues. She consistently stated that she did not trust S Jr., and that she did not want to be near him. Her specialized emotional needs require that her caregivers be able to adhere to a designated appropriate safety plan to prevent M.N. from future sexual victimization.

[16] The trial court identified at least ten social service agencies and charita-

ble organizations that had provided support, counseling, or services to the children, the respondent, and B.F.

[17] Practice Book § 32a-4 provides in relevant part: "(b) Any party who intends to call a child or youth as a witness shall first file a motion seeking permission of the judicial authority. . . .

"(d) The judicial authority with the consent of all parties may privately interview the child or youth. Counsel may submit questions and areas of concern for examination. The knowledge gained in such a conference shall be shared on the record with counsel and, if there is no legal representation, with the parent."

[18] See *Manaker* v. *Manaker*, 11 Conn. App. 653, 655–57, 528 A.2d 1170 (1987) (judge able to disregard evidence not properly admitted).

[19] The court then explicitly denied the joint motion for the children to testify.

[20] The respondent filed a motion for review with this court, asking that his motion for review be granted and that this court order the trial court to hold a hearing at which Judge Rubinow and others appear to create an appellate record for review. The petitioner objected to the motion for review. This court granted the motion for review, but denied the relief requested.

[21] In her brief, the petitioner argued that the respondent waived his claim that he was deprived of a fair trial because he consented to the court's meeting ex parte with the children in the courthouse and also responded in the negative to the court's asking the parties whether anyone needed to hear anything further from the court in report of its observations with the children. Because we conclude that the respondent was not deprived of a fair trial, we need not decide whether he waived the right to raise the claim on appeal.

[22] See Practice Book § 32a-4 (d) (judicial authority with consent of all parties may privately interview the child; knowledge gained in such conference shall be shared on the record with counsel).

We further note that the court's prompt report to the parties and their counsel is consistent with rule 2.9 (b) of the Code of Judicial Conduct, which provides, "[i]f a judge inadvertently receives an unauthorized ex parte communication bearing on the substance of a matter, the judge shall make provision promptly to notify the parties of the substance of the communication and provide the parties with an opportunity to respond." The court gave the respondent an opportunity to respond, but he or his counsel chose not to so.

[23] Rule 2.11 (a) of the Code of Judicial Conduct provides in part: "A judge shall disqualify . . . herself in any proceeding in which the judge's impartiality might reasonably be questioned . . . ."

[24] The respondent does not assert that the court was actually biased or motivated by anything other than a good faith desire to make the children feel enfranchised in the legal proceedings, about which they had questions and concerns.

———————————————————