******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE LUIS N. ET AL.*
(AC 39953)

Lavine, Prescott and Harper, Js.

*Syllabus*

The respondent mother appealed to this court from the judgments of the
trial court terminating her parental rights with respect to her two minor
children. In response to a motion filed by the mother seeking to have
the children, who were six and seven years old at the time, testify at
the termination trial, the court ruled that, in lieu of testimony, it would
invite the children to the courthouse so that they would have an opportu-
nity to get to know the court and observe the courtroom, and to under-
stand that the court would be deciding the case, and all counsel agreed
to the procedure outlined by the court for the meeting. The court made
no inquiry of the children during the visit, during which one of the
children spontaneously stated that she would be willing to stay with
her foster mother or go back to the respondent, and during which the
children's guardian ad litem and a visitation supervisor for the Depart-
ment of Children and Families were present. Following the meeting,
the court stated on the record what had transpired, and it had the
guardian ad litem make a statement regarding comments of the children
during the meeting. *Held*:

1. The respondent mother could not prevail on her unpreserved claim that
   the trial court violated her right to due process by improperly considering
   evidence that it had gleaned from its ex parte meeting with the children
   in terminating her parental rights: although the record was adequate
   for review, and the claim was of constitutional magnitude and reviewable
   under *State* v. *Golding* (213 Conn. 233), any claimed error was harmless,
   as the mother failed to identify any evidence in the court's memorandum
   of decision that was not presented during the termination trial and to
   identify any facts found by the court, in either the adjudicatory or
   dispositional phase of the trial, that were clearly erroneous; moreover,
   the mother failed to demonstrate that it was plain error for the court
   to consider evidence gleaned from the ex parte meeting with the chil-
   dren, as she did not challenge the court's findings regarding the reason-
   able efforts to reunify her with her children and her failure to achieve
   a sufficient degree of personal rehabilitation, and did not demonstrate
   any harm and that the failure to reverse the judgments terminating her
   parental rights would result in manifest injustice.

2. There was no merit to the respondent mother's claim that the trial court
   violated her right to due process by failing to timely canvass her pursuant
   to *In re Yasiel R.* (317 Conn. 773), which requires a trial court to canvass
   a parent who does not consent to the termination of parental rights
   prior to the start of the termination trial in order to ensure the overall
   fairness of the termination process: although the mother claimed that
   the trial court's canvass was not timely because it did not occur at the
   start of trial and was done after the termination trial had begun, because
   *In re Yasiel R.* was not decided until after the commencement of the
   mother's termination trial, the court could not possibly have canvassed
   her in accordance with that case prior to trial, and there was no dispute
   that the court did canvass the mother in accord with *In re Yasiel R.*
   during the course of the termination trial; moreover, the mother's claim
   that the canvass was defective because the court did not inform her
   that it had to be administered before trial started was unavailing, as the
   required canvass did not exist before the commencement of the mother's
   termination trial.

3. The trial court's finding that the respondent mother had failed to achieve
   a sufficient degree of personal rehabilitation as would encourage the
   belief that, within a reasonable time, considering the age and needs of
   the children, she could assume a responsible position in their lives was
   supported by clear and convincing evidence; the court's memorandum
   of decision contained a detailed history of the mother's pattern of sub-
   stance abuse, including her use of illegal drugs during the termination
   proceedings despite the specific step to refrain from that activity, the

court found that the mother did not appreciate the negative effect that her use of marijuana had on her capacity to meet the needs of the children or to keep them safe, and it acknowledged the mother's love for her children and her desire for reunification but found that, although the mother had achieved a period of sobriety for approximately six months prior to the end of the termination trial, her sobriety was too fragile and untested to lead to the conclusion that she would be able to tend to the special needs of the children within a reasonable time, and that the mother's desires, however sincere, were insufficient to sustain the children and to provide them with a safe, secure, and permanent environment.

4. The respondent mother could not prevail on her claim that the trial court improperly had concluded that the termination of her parental rights was in the best interests of the children, the mother having failed to identify any factual findings of the court that were clearly erroneous; that court was constrained to conclude, given the ages and stages of development of the children and their particular educational and emotional needs, that allowing more time for the mother to become able and willing to provide safe, reliable, and attentive care for the children would unreasonably relegate the children's best interests to a level of uncertainty, without a valid basis for determining that reunification could be achieved within a reasonable time, and the court properly concluded that to delay termination of the mother's parental rights would unduly interfere with the children's access to permanency that would enhance their opportunities and potential for healthy development.

Argued May 31—officially released July 27, 2017**

*Procedural History*

Amended petitions by the Commissioner of Children and Families to terminate the respondents' parental rights as to their minor children, brought to the Superior Court in the judicial district of Middlesex, Child Protection Session at Middletown, where the court, *Rubinow, J.*, denied the respondents' motion to present child testimony; thereafter, the matter was tried to the court; judgments terminating the respondents' parental rights, from which the respondent mother appealed to this court. *Affirmed.*

*David J. Reich*, for the appellant (respondent mother).

*Frank H. LaMonaca*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*Opinion*

LAVINE, J. The respondent mother, B.F., appeals from the judgments of the trial court terminating her parental rights in her son, L.N., and daughter, M.N.[1] On appeal, the respondent claims that the court (1) violated her right to due process by meeting with the children ex parte, (2) failed timely to canvass her pursuant to *In re Yasiel R.*,[2] (3) erred by concluding that she had failed to rehabilitate to the degree that she could not be restored as a responsible parent within a reasonable time, and (4) erred by finding that it was in the best interests of the children to terminate her parental rights in them. We affirm the judgments of the trial court.

In a detailed, 120 page memorandum of decision, the trial court, *Rubinow, J.*, made the following findings of fact that are relevant to the issues in the present appeal. L.N., who was born in July, 2008, and M.N., who was born in June, 2009, came to the attention of the Department of Children and Families (department) in February, 2011. The children resided with the respondent, but not their father, S.N., who never married the respondent. The respondent was overwhelmed caring for the children, but they remained in her custody until October 11, 2011, when the department removed them pursuant to General Statutes § 17a-101g. On October 21, 2011, the court, *Hon. William L. Wollenberg*, judge trial referee, sustained the orders of temporary custody and ordered specific steps for the respondent to assist her reunification with the children.

On May 31, 2012, the court, *Frazzini, J.*, adjudicated the children neglected as to the respondent[3] on the ground that they were exposed to conditions injurious to their well-being.[4] The court ordered the children committed to the custody of the petitioner, the Commissioner of Children and Families, and ordered new specific steps for the respondent to facilitate reunification. See General Statutes § 46b-129. On December 12, 2012, the petitioner filed petitions to terminate the respondent's parental rights in the children and amended the petitions on September 6, 2013. The petitioner alleged that the department had made reasonable efforts to locate the respondent and reunify her with the children but that she was unable or unwilling to benefit from reasonable reunification efforts. The petitions also alleged that the respondent had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the ages and needs of the children, she could assume a responsible position in their lives, and that termination of her parental rights was in the best interests of the children.

Trial on the termination petitions commenced on November 24, 2014, and continued on approximately sixteen days until August 3, 2016. The court heard from

approximately nineteen witnesses. On January 15, 2016, the court appointed Sam Christodlous, an attorney, to serve as guardian ad litem for the children. On January 29, 2016, Judge Rubinow canvassed the respondent in accordance with *In re Yasiel R.*, 317 Conn. 773, 795, 120 A.3d 1188 (2015).

The court found the following facts with respect to the respondent. She was born in 1989 and was herself removed from her mother's care due to neglect. Her grandmother adopted her when the respondent was ten years old. Her family history is significant for mental health issues and alcohol and drug abuse. As a child, the respondent was beaten, raped, and subjected to domestic violence; as an adult, she is troubled by memories of those incidents. In her youth, the respondent suffered from seizures and received mental health counseling. The respondent left high school in the tenth grade and has held occasional and temporary employment at a video game store, an election center, and a barber shop. She found full-time employment at a laundry service in October, 2013.

After the department became involved with the family, it referred the respondent for in-home services to address L.N.'s delayed speech and M.N.'s unspecified developmental issues. The respondent also was referred to parenting classes with case management services. Over the next several months, the respondent's participation in those services was inconsistent. Moreover, her mental health deteriorated, she was isolated in her apartment, she and the children were unkempt, and she failed to respond to the children's cues for attention. The respondent had difficulty paying her rent, and a third party with a child was living in her home. The in-home service providers recommended that the respondent receive individual therapy and medication management services.

The respondent was referred to Valarie Williams, a licensed psychologist, for a clinical assessment. The respondent's mental health history included bipolar disorder, depression, and post-traumatic stress disorder. She had a history of insomnia, crying spells, poor concentration, mood swings, irritability, aggressive behavior, and poor impulse control. She was taking the medication Klonopin. The respondent had a limited circle of friends and was on probation for robbery in the second degree. Williams diagnosed the respondent with major depressive disorder and post-traumatic stress disorder, and referred her to a psychiatrist.

The court found that the respondent had a history of illegal drug use that began when she was thirteen years old. She had a pattern of using illegal drugs, participating in treatment, remaining drug free for a time, and relapsing, a pattern that persisted during the termination proceedings and when the respondent was caring for her youngest child, E.T. The department referred

the respondent to Catholic Charities' Institute for the Hispanic Family for drug screening and evaluation. When the respondent was evicted from her home in the fall of 2011, the department removed the children from her care. Although the respondent was homeless for months, she continued to receive department sponsored services and had supervised visits with the children twice a week.

Throughout the first six months of 2012, the respondent tested positive for marijuana and cocaine. Williams discharged the respondent from individual counseling in June, 2012, because she failed to attend scheduled therapy sessions and to consult a psychiatrist, as recommended. In June, 2012, Bruce Freedman, a licensed psychologist, conducted a court-ordered psychological evaluation of the respondent, which included an assessment of her interaction with the children. Freedman determined that the respondent's intelligence is at the low end of the average range. In September, 2012, the respondent was referred to Community Renewal Team to address her mood instability, post-traumatic stress disorder, and marijuana use.

By December, 2012, the respondent was living with V.G., a man with a criminal history involving crimes of violence, including risk of injury to a child. V.G. physically abused the respondent. The department recommended that the respondent engage in domestic violence prevention services, but she refused. In January, 2013, the respondent was evicted from the apartment she shared with V.G. and continued to test positive for marijuana use. Community Renewal Team discharged her from its services and referred her to the Institute of Living. The court found no evidence that the respondent availed herself of the referral to the Institute of Living.

During the summer of 2013, the respondent was enrolled in anger management, domestic violence, and parent education programs at the Family Intervention Center. By September, 2013, she had attended a three day per week, three hour per day program where her substance abuse issues were to have been addressed. The respondent, however, did not complete the domestic violence and anger management programs, nor did she engage in the follow-up after substance-abuse relapse prevention program or individual counseling that were recommended to her.[5]

The respondent had been employed by a salon to cut hair, but in October, 2013, with help from her cousin, she obtained employment at a laundry service in another community, where a man, L.T., was employed. The respondent worked from 7 a.m. until 3 p.m., Monday through Thursday, and therefore she claimed that she was unable to participate in services offered by the department. In late December, 2013, Freedman conducted a second court-ordered psychological evaluation of the respondent, which also included an

assessment of her interaction with the children. As of January, 2014, the respondent was still using illegal drugs and admitted to smoking seven to eight blunts per day.

In March, 2014, the respondent moved to the community where the laundry service was located to live with L.T.[6] in a two bedroom apartment she had obtained with the assistance of a cousin and her grandmother. Although she was no longer receiving counseling, the department provided her with supervised visits with the children.

In August, 2014, the respondent became pregnant with her third child. In response to advice she received from her prenatal care provider, the respondent went to Perspectives Counseling Center and stated that she needed counseling. She reported a history of sexual abuse, physical abuse, domestic violence, counseling, psychotropic medication, and criminal activity. She also reported that she was in a domestic relationship with L.T., whom she described as being good and supportive. Perspectives Counseling Center diagnosed her with a major depressive disorder and recommended that she engage in individual and group therapy. Despite telling her service provider and the department that she had stopped using illegal drugs as of January, 2014, the court found that drug tests indicated that in November, 2014, while she was pregnant, the respondent tested positive for marijuana use. She tested positive for cocaine use in December, 2014, and marijuana use in January, 2015.

In February, 2015, the respondent returned to her hometown with L.T., after she had obtained a subsidized two bedroom apartment. The department referred the respondent to the Wheeler Clinic for substance abuse and mental health evaluations. Due to her pregnancy, the respondent was put on bed rest in March, 2015, and did not engage the recommended services at Wheeler Clinic.

In April, 2015, the respondent gave birth to a son, E.T. Because the respondent used illegal drugs during her pregnancy, the department became involved with the "new" family and filed a neglect petition on behalf of E.T., who remained in the custody of the respondent and L.T. The respondent's family and L.T.'s family helped care for E.T.

During the last phase of her pregnancy and after E.T. was born, the department transported L.N. and M.N. to visit the respondent in her home once a week. The court found that, under supervision, the respondent gave appropriate attention to all three of her children. In May, 2015, the department referred the respondent to relapse prevention with Catholic Charities, but she did not utilize those services until November, 2015. On her own initiative, however, the respondent returned to Williams for individual counseling. She admitted that

she used cocaine and marijuana in October, 2015, when she was E.T.'s legal guardian. Hair segment analysis on December 21, 2015, demonstrated that the respondent recently had used both cocaine and marijuana. The respondent continued to test positive for cocaine and marijuana in 2016, but her segmented hair analyses conducted on July 28, 2016, demonstrated that she had been drug free for approximately six months.

By January 13, 2016, L.T. was no longer living with the respondent in her subsidized housing.[7] She claimed, however, that he continued to coparent E.T. On January 14, 2016, pursuant to a motion filed by the petitioner, the court, *Woods*, *J.*, ordered that E.T. be moved from protective supervision to committed status.

The respondent had regular supervised visits with the children since they were removed from her home in October, 2011. The court found that the visits were cordial, involving physical activities, watching movies, or using a computer to access child appropriate websites. The respondent always brought food, toys, or an activity to the visits, and neither L.N. nor M.N. wanted her to leave when the visits ended. The respondent knew the location of the school the children attended, but she did not understand the nature or extent of their special education or behavioral health needs. She believed that she could provide adequate parental care for L.N. and M.N., even though she was also responsible for E.T., because the baby slept most of the time.

In its memorandum of decision, the court set forth the elements of General Statutes § 17a-112 (j),[8] which the petitioner was required to prove by clear and convincing evidence to prevail on the petitions to terminate the respondent's parental rights in L.N. and M.N. The court found by clear and convincing evidence that the department had made reasonable reunification efforts for the respondent during the adjudicatory period[9] and that she was unable or unwilling to benefit from reunification efforts offered by the department.[10]

The court also found that the petitioner had demonstrated by clear and convincing evidence that the respondent had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and specialized needs of the children, she could assume a responsible position in their lives.[11] The respondent's failure to achieve statutory rehabilitation, the court found, was clearly and consistently evident from her pattern of recurrent substance abuse. Although the respondent participated to varying degrees in numerous services and counseling offered, she consistently returned to using cocaine and marijuana after treatment. The court found that the use of such drugs, whether in response to stress or for recreational purposes, was highly inconsistent with a parent's ability to provide safe, reliable, and consistent parenting in

order to assume a responsible position in the lives of L.N. and M.N. The respondent's pattern of treatment, abstinence, and relapse was particularly evident from 2011 to 2015, and throughout the termination of parental rights proceedings.

The court acknowledged that in late 2015, after returning to individual counseling with Williams, the respondent reentered substance abuse treatment at Catholic Charities and at the conclusion of evidence in the termination of parental rights trial, the respondent was no longer using illegal drugs. The evidence was insufficient, however, for the court to conclude that the respondent had acquired the necessary skills to maintain abstinence. Her sobriety at the time was too fragile, too untested, and too unreliable for the court to infer that the respondent had developed the internal resources to ensure that she would put the needs of L.N. and M.N. above her own.

The court also found that even if, in 2016, the respondent was better able to manage her own life, her progress was modest and had to be viewed in the context of a parent whose children were removed from her care due to her recurrent drug use. The court noted the respondent's return to individual counseling, but also noted her failure to disclose information about her personal and parental instability, which was likely to lead to relapse. The court stated that the respondent had not achieved a degree of insight into her proclivity to relapse when faced with stress, as would encourage the belief that she was even capable of learning to fulfil a responsible role in the lives of L.N. and M.N. The court concluded that even if, by the first half of 2016, the respondent had made some progress in recovering from drug abuse and improving her parenting skills, "those efforts were too little and too late" to meet the general or particular needs of the children.

With respect to the children, the court found that L.N. and M.N., were eight and seven years old, respectively, in 2016. Both of them have extraordinary specialized needs that require consistent, reliable attention from an alert and available parent figure to ensure that their emotional, educational, medical, and physical needs are addressed properly. Although the respondent has expressed love and affection for the children, the evidence clearly and convincingly established that since they entered foster care, the respondent rarely expressed concern over their health, education, and general well-being as would be expected of a parent. She provided the children with food and clothing on occasion, but she had not provided them with medical care or an adequate domicile since 2011.

In making its findings and coming to its conclusions, the court considered the respondent's complex circumstances, including her involvement with men who were not stable or responsible enough to remain a part of

her household. In view of the respondent's repeated relapses into illegal drug use, which is incompatible with the need for safe custody of school-age children, and given the need for the department to intervene to keep E.T. safe when the respondent had no responsibilities to care for L.N. and M.N., the court found that even if the respondent is capable of caring for E.T., her progress has been *too little too late for L.N. and M.N.*

After finding that the respondent had failed to rehabilitate, the court turned to the dispositional phase of the proceedings to consider the best interests of the children. The court considered the children's present needs for sustained growth, healthy development, well-being, stability, and continuity of their environment, along with their need for consistent, structured care by a responsible parent figure ready, willing, and able to address their needs.

The children have lived together in the same foster home since their earliest years. They enjoy their visits with the respondent and E.T. Given the children's ages and stages of development, and their particular educational and emotional needs, the court concluded that to allow more time for the respondent to become able and willing to provide predictably safe, reliable, and attentive custodial care for the children would unreasonably relegate their best interests to a level of uncertainty, without a valid basis for determining that reunification with the respondent can practically be achieved within a reasonable time. Further delay in the termination of parental rights proceeding would unduly interfere with the children's access to a permanent placement that will enhance their opportunities for healthy human growth. The court stated that it had balanced the respondent's constitutionally protected relationship to L.N. and M.N. against the children's respective needs for permanency, security, safety, the opportunity for healthy growth, and consistency in environment.

The court made the following findings as required by § 17a-112 (k). The reunification services the department provided to the respondent and the children were timely and appropriate. The respondent, however, was not able to improve her ability to serve as a safe, effective parent to the children pursuant to the steps ordered for her. L.N. was three years old at the time the department removed him from the respondent's care and eight years old at the conclusion of the termination proceedings. M.N. was two years old when she was removed from the respondent's care and seven years old when the termination proceedings ended.

The court also found that the children were bonded to one another. They know that the respondent is their biological mother even though they have lived in foster care since October, 2011. The children's emotional ties to the respondent are based on the regular visits they

have had with her since 2011. L.N. loves the respondent and is attached to her and E.T. M.N. loves the respondent, but she sometimes indicates that she wishes to spend time alone with the respondent without L.N. Generally, both of the children do not want to leave the respondent at the conclusion of a visit and have expressed a desire to return to her custody. Neither child, however, looks to the respondent for "environmental" support.

The children have lived with their foster mother since October, 2011, and have close emotional ties to her and are bonded to her biological children. The children also have emotional ties to the foster mother's domestic partner, whose schedule permits him to take the children to services from time to time, while the foster mother works as a certified medical technician.

Although the respondent has limited financial resources, her economic circumstances have not prevented her from maintaining a meaningful relationship with either child. The court found that the respondent had lawful employment at a laundry service and benefitted from subsidized housing. The respondent's decisions about her personal life and her inability or unwillingness to benefit from reunification efforts, not economic factors, impeded her ability to develop a meaningful, parent-like relationship with the children. The respondent argued that the children's foster mother impeded her relationship with the children due to the foster mother's inability or unwillingness to give the children appropriate attention or to attend parent counseling at Klingberg Family Centers. The respondent also claims that the foster mother did not ensure that L.N. consistently attended counseling and that M.N. consistently attended therapy. The court did not condone the foster mother's inconsistency in transporting the children to counseling, but it found that her conduct did not prevent the respondent from maintaining a meaningful relationship with the children. The court credited the testimony of the guardian ad litem, Christodlous, that the foster mother attempted to involve the respondent in the children's activities, such as birthday parties.

In coming to its conclusion as to the best interests of the children, the court considered their specialized needs in the context of the respondent's response to reunification efforts and her failure to rehabilitate. The court fully credited Christodlous' opinion that termination was in the best interests of the children, which was founded on what the court described as his thorough investigation of the children's and the respondent's circumstances. The court found by clear and convincing evidence that the respondent had not reached the point where she could, on a daily basis, meet the best interests of either L.N. or M.N.

On November 15, 2016, the court issued a memoran-

dum of decision in which it terminated the parental rights of the respondent in the children. The court, *Vitale, J.*, granted the respondent's application for the waiver of fees to appeal. The respondent thereafter appealed.

Before addressing the respondent's claims on appeal, we review the legal framework for deciding termination of parental rights petitions. "[A] hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (3)] exists by clear and convincing evidence. . . . If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Elijah G.-R.*, 167 Conn. App. 1, 18–19, 142 A.3d 482 (2016).

I

The respondent first claims that the court improperly considered evidence it gleaned from its ex parte meeting with the children without utilizing the due process protections that are required by Practice Book § 32a-4 and our case law. We disagree.

The respondent's claim arises from the following facts and procedural history. In January, 2016, the respondent and S.N. expressed an interest in having L.N. and M.N. testify at the termination of parental rights trial, but they wanted to protect the children from cross-examination. Pursuant to Practice Book § 32a-4 (b),[12] they filed a joint motion requesting permission for the children to testify, arguing that the children, ages six and seven years old at the time, were parties to the termination proceedings and should be permitted to testify on their own behalf. The respondent and S.N. represented that during their respective visits with the children, the children expressed a desire to live with the parent with whom they were visiting at the time. The respondent and S.N. argued that the children's testimony was crucial in determining the best interests of the children and, therefore, relevant. On January 15, 2016, before the court ruled on the motion, Alina Bricklin-Goldstein, attorney for the children, filed a motion for the appointment of a guardian ad litem. Counsel for the petitioner, respondent, and S.N. did not object to the motion, which the court granted. Christodlous was appointed guardian ad litem for the children.

The joint motion for the children to testify came before the court on March 18, 2016. Before ruling on the motion, the court described the children as "very young" and, in lieu of testimony, offered to invite the

children to come to the courthouse to see the court-room's physical structure; to meet the court reporter, the marshal, the clerk, and the judge; and to spend time on the bench. The court, however, would not hear the children testify, concluding that it was not in the best interests of the children to put them in the position where they were either subject to cross-examination or where they could infer that something that they said could determine the outcome. The court stated that it would not ask the children whether they want to live with their father or their mother, as it would find no value from any answer either of the children might give.

The court asked Christodlous whether he knew the children well enough to have an opinion as to whether they would benefit from an opportunity to visit the court. Christodlous stated that he thought that he knew the children well enough and: "I think because the children so much want to see what happens in this court, I don't think they should necessarily be here during the hearing, but I do think [it would] be very beneficial for them to come in, see the courtroom, meet Your Honor, too. . . . [T]hey understand through their lawyer that Your Honor makes the decision, no one else does. They've got a good relationship with [Bricklin-Goldstein], but I do think it would be very beneficial for them to be able to come into the courthouse to see the courtroom, to see what Your Honor does, to see who you are, those kinds of things." He also opined that it would be beneficial for the children if he and Bricklin-Goldstein were present, but he did not think that the respondent and S.N. should be present. The following colloquy between the court and Christodlous transpired:

"The Court: If the court inquired of the children only as to whether they had any questions for the court, do you think that would suffice in franchising them with regard to this process without infringing upon what should be, at their ages and stages of development, as innocent as is practicable, a perception of reality?

"Attorney Christodlous: I think so. I can't give [a] 100 percent answer on that, but I think so yes, Your Honor.

"The Court: Do you know of any therapeutic basis why the—either child should not be allowed to come into the courtroom and see what's going on here?

"Attorney Christodlous: I do not, and I personally believe it would be beneficial for them to be here."

Bricklin-Goldstein stated that coming to the courtroom would be a great experience for the children. Counsel for the respondent and S.N. stated that their clients were satisfied with the procedure the court outlined. The court inquired of the assistant attorney general, Frank H. LaMonaca, whether the department could bring the children to court at 9 a.m. on April 27, 2016. LaMonaca suggested that the foster mother could bring

the children to court. The court declined to permit the foster mother to bring the children to court.

The court ordered the department to produce the children at the courthouse on April 27, 2016, and to take them to the juvenile clerk's office where they could be brought to the courtroom by the clerk with the assistance of Bricklin-Goldstein and Christodlous. The judge would be present at 9 a.m. on that date. The court further stated that it was "the court's expectation that the children . . . will not be subject to a recording process; this is not an opportunity for them to give testimony. If they do have a question for the court, Mr. Christodlous will be here, and I hope you will accept his explication of and response [to] what it is they asked, or what it is they had to say. In the event that they should create any drawings, as sometimes happens when kids are in court and are faced with a great big desk like this and see pens and paper on it, the court will, of course, save them and make them available to counsel. But, I do not expect to obtain any testimony. They won't be subject to cross-examination. So, even if they should say something, they won't be under oath, and it will not be evidence. Is that satisfactory?" No counsel objected.[13]

The court met with the children in the courthouse on April 27, 2016. When court reconvened later that morning, the court stated on the record: "Counsel, before court commenced today in resolution of the motions for child testimony that had been filed, the court had made arrangements to meet with the children so they would have the opportunity, as you all had agreed, to get to know the court, to understand that the court and the court alone would be making the decision in this case and to observe the facilities, particularly the courtroom in which the case has been ongoing for so many years.

"This court had the opportunity to observe the children interacting with court staff at the child protection clerk's office. This court had the opportunity to observe the children interacting with court staff and with the [department] visitation supervisor who was present at the request, I understand, of the children's counsel and their guardian ad litem during this process. Several spontaneous comments were made by the children, by [L.N.] in particular. I will repeat them only if you request, but before I do so, there was in the presence of the court, but not on the record, and the marshal was also present and the marshal trainee was also present as was the clerk. I believe the monitor was still in the room as well.

"There was an inquiry of the children related to the children's desired outcome in these proceedings presented by an individual notwithstanding any orders that had been issued by the court previously to enhance the court's opportunity to see the children in as neutral a

setting as possible, and the goal, again, was to enhance the children's understanding that the court and the court alone would be making decisions in this case. I believe . . . Christodlous could summarize that which occurred. . . . I don't attribute any intent on any party.

* * *

"Attorney Christodlous: The children made some statements which the [department] visitation supervisor did not believe Your Honor heard and repeated them, the statement directly to Your Honor. He felt— he was thinking he was assisting, did not [intend] any harm, but he did repeat the statements, which the children had made, and I do not know whether Your Honor had heard the statements initially made by the children, but he repeated [them], and I'm quite clear Your Honor heard what he said . . . because Your Honor indicated to him that you did not want to hear from him.

"The Court: The court did hear all of the comments that were made by the children in the courtroom. Their visit in this courtroom was directed at achieving the one goal I identified, so that they would see the courtroom, have the opportunity to observe the facilities, and understand the environment in which the case is being tried. This court made no inquiry of the children as to what they desire. To the extent the court now has had the opportunity to observe the children, if that is not a part—their behavior and their demeanor is not a part of the report by the guardian ad litem at the appropriate time during the case, and I rather expect it will be, I will bring to your attention then that which I observed. I can do that now if you'd like, but my goal was not to acquire evidence for the use in the case. That's what . . . Christodlous' presence . . . at the visit to the courtroom was for, so he can [be] cross-examined.

"It is not that the court attributes no value to what the children said, the court does not know enough about these children to place their comments in any context one way or another. [There have] been sufficient concerns raised throughout the course of the evidence concerning the status of the children and supported by the court's observation of their behavior and demeanor today both in the child protection clerk's office and in the courtroom."

The court then directed Christodlous to consider and investigate the children's best interests and to inform the court of his opinion regarding the nature, type, and scope of a placement environment to address the best interests of each child in sustained growth, development, well-being, continuity, stability, and conduct as they grow into their preteen and teenage years that will most likely lead to their success in the community. Christodlous agreed to do so. The court then asked whether anyone needed to hear further from the court

regarding its observations of the children. All counsel responded in the negative.

On August 3, 2016, Christodlous testified, in relevant part, as follows: "I . . . met with the children on six separate occasions. I met with them at both parents' homes, at the foster parent's home, the school, and of course, here in the court. I have had an opportunity to sit down and talk to the children as well as [department personnel] and the [children's] attorney. I've also discussed this matter with all the attorneys involved in this matter. I have reviewed all the records that were—the exhibits which were in the court file. And again, I did read all the transcripts and prepare that way. I listened to testimony while here on the case since I was appointed, and I had questions which were asked on my behalf by other parties in this matter when they came up. . . .

"[T]he only time the children were in the courtroom, one of the children actually changed what she had said earlier to her attorney in my presence. And what she had said the last time we were here was that she would be willing to stay with her foster mom or go back to her parents. I did take that as a sign that she has become quite comfortable at her foster [parent's], which supports what I saw when I was there." On cross-examination by the respondent's counsel, Christodlous testified that M.N. once had expressed that she wished to live with the respondent, but she also stated that she would be happy to stay with her foster mother. M.N.'s statement about staying with her foster mother was made when she was in the courthouse.

On January 25, 2017, after Judge Rubinow had issued her memorandum of decision, the respondent filed a motion for articulation in which she asked the court "to articulate the legal and factual details of [the court's] April 27, 2016 meeting with the two children who are the subject of this termination proceeding."[14] The petitioner objected to the motion for articulation. On February 23, 2017, the court, *Olear, J.*, responded to the motion for articulation, noting that Judge Rubinow had retired as a judge of the Superior Court on November 16, 2016. Judge Olear declined to hold a hearing on the respondent's motion as a hearing would not provide any information that would be sufficient to permit the court to respond to the motion for articulation. Judge Olear denied the motion for articulation.[15]

### A

The respondent claims that the court considered evidence it gleaned from its ex parte meeting with the children in terminating her parental rights in them, thereby violating her constitutional right to due process. The respondent did not preserve this claim at trial and seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[16] We will review the claim

because the record is adequate for review and the claim is of constitutional magnitude. See *In re Tayler F.*, 296 Conn. 524, 553, 995 A.2d 611 (2010) (right to confrontation and cross-examination in civil action grounded in due process clauses of fifth and fourteenth amendments). The respondent cannot prevail, however, because she has (1) not identified what, if any, evidence in the court's memorandum of decision was not presented during the termination trial and (2) failed to identify any facts found by the court, in either the adjudicatory or dispositional phase of the trial, that are clearly erroneous.[17] See *Manaker* v. *Manaker*, 11 Conn. App. 653, 656–57, 528 A.2d 1170 (1987) (judge able to disregard evidence not properly admitted). In other words, the petitioner has demonstrated that the claimed error, if any, was harmless.

B

The respondent also claims that it was plain error for the court to consider evidence it gleaned from its ex parte meeting with the children.[18] The respondent cannot prevail under the plain error doctrine for the same reasons that she cannot prevail pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40. See part I A of this opinion. The respondent has not challenged the trial court's findings that the department made reasonable efforts to reunite her with the children or that she failed to make sufficient progress toward the fundamental treatment goal of being a safe and nurturing parent for the children, and, therefore, failed to achieve a sufficient degree of personal rehabilitation. She also has failed to identify any clearly erroneous factual finding relevant to the court's determination that termination is in the best interests of the children. In other words, the respondent has failed to demonstrate harm and that failure to reverse the judgments terminating her rights in L.N. and M.N. would result in manifest injustice. See *In re Sydnei V.*, 168 Conn. App. 538, 563–64, 147 A.3d 147, cert. denied, 324 Conn. 903, 151 A.3d 1289 (2016) (party claiming plain error must demonstrate error clear, obvious, and indisputable).

Although the respondent did not have the opportunity to cross-examine the children and the department visitation supervisor immediately after meeting with the children, the court stated on the record what had transpired during the meeting and inquired of the respondent and others whether they wished further explanation.[19] All counsel declined further explanation by the court. Moreover, the court instructed Christodlous to report what transpired at the meeting, including the spontaneous comment made by one of the children that was repeated by the department visitation supervisor. The respondent was given an opportunity and did cross-examine Christodlous.[20] The respondent failed to identify any evidence the court relied upon that was not presented at trial. The respondent, therefore, cannot

prevail under the plain error doctrine.

## II

The respondent's second claim is that the court violated her right to due process because, although it canvassed her pursuant to *In re Yasiel R.*, supra, 317 Conn. 773 (*Yasiel* canvass), it did so after the termination of parental rights trial had begun, and it failed to inform her that the canvass is to be given at the start of trial. The claim lacks merit.

The fallacy in the respondent's claim is illustrated by the following timeline. Trial on the petitions to terminate the respondent's parental rights in L.N. and M.N. commenced on *November 24, 2014*. Our Supreme Court issued its decision in *In re Yasiel R.*, supra, on *August 18, 2015*; id., 774; more than eight months after trial commenced. The court could not possibly have canvassed her prior to trial because the requirement did not then exist. There is no dispute, however, that the court canvassed the respondent in accord with *In re Yasiel R.*, on January 29, 2016. The respondent claims that the canvass was defective because the court did not inform her that the canvass is to be administered before trial started. The respondent's claim does not rise to the level of a due process violation.

We briefly review the history of our Supreme Court's supervisory order regarding the *Yasiel* canvass. Our Supreme Court exercised its supervisory authority; see Practice Book § 60-2; "to require that a trial court canvass a parent who does not consent to the termination prior to the start of a termination of parental rights trial, in order to ensure the overall fairness of the termination of parental rights process." *In re Yasiel R.*, supra, 317 Conn. 776.

The "procedural safeguard requiring that a trial court canvass a parent prior to a termination of parental rights trial does not substantially decrease any risk of erroneous deprivation of her right to family integrity. When the respondent is represented by counsel, the current procedures in place adequately protect the respondent from any claimed constitutional deficiencies." Id., 785. Our Supreme Court held that a respondent who was represented by counsel was not constitutionally entitled to a canvass regarding her trial counsel's strategy. Id., 793. Nonetheless, the court recognized "that the lack of a canvass of all parents in a parental rights termination trial may give the appearance of unfairness insofar as it may indicate a lack of concern over a parent's rights and understanding of the consequences of the proceeding. Therefore, [it] conclude[d] that public confidence in the integrity of the judicial system would be enhanced by a rule requiring a brief canvass of all parents immediately before a parental rights termination trial so as to ensure that the parents understand the trial process, their rights during the trial and the potential

consequences." Id., 793–94. In issuing that order, our Supreme Court stated that it was "not convinced that the trial court's failure to canvass the respondent constituted a denial of her right to due process under the fourteenth amendment to the United States constitution." Id., 776.

The respondent argues that the court should have told her that the canvass was to be given before trial. We disagree and note that several decisions of this court have held that failure to give the *Yasiel* canvass prior to trial does not require reversal of the judgment terminating parental rights. See *In re Sydnei V.*, supra, 168 Conn. App. 557 (court failed to canvass respondent); *In re Elijah G.-R.*, supra, 167 Conn. App. 7 (respondent canvassed after evidence but before judgment rendered); *In re Raymond B.*, 166 Conn. App. 856, 863, 142 A.3d 475 (2016) (respondent canvassed on second day of trial); *In re Leilah W.*, 166 Conn. App. 48, 58, 141 A.3d 1000 (2016) (respondent canvassed after evidence concluded but before judgment rendered). Unlike the present case, trials in those cases, except *In re Elijah G.-R.*, commenced after our Supreme Court issued *In re Yasiel R.*

"Although there were some differences in the way in which the canvasses were conducted in those cases, this court concluded that the stated purpose underlying the *Yasiel* canvass was met even though the respondents were not canvassed prior to the termination trial. In coming to that conclusion in each case, this court considered the factors the *Yasiel* canvass was intended to address and the actual trials of the subject cases. This court found . . . that on appeal, the respondents failed to explain how they were harmed by the timing of the *Yasiel* canvass, whether they would have moved for a new trial or asked that the evidence be opened and what additional evidence they might offer that would have made a difference in the trial. The respondents in each case argued only that the timing of the canvass itself was harmful. . . . Although the trial court in the present case did not canvass the respondent, she has failed to explain what she did not know or understand about the termination of her parental rights without the court's canvass. She has not explained what she would have done differently if the court had canvassed her and how the outcome of the case would be different. In other words, the respondent has failed to explain how the court's failure to canvass her was harmful per se." (Citation omitted; footnote omitted.) *In re Sydnei V.*, supra, 168 Conn. App. 567–68.

The respondent argues that the court failed to inform her that she could have requested a mistrial or reopened the evidence because the court did not inform her that the canvass was to be given before trial began. The argument defies logic; the *Yasiel* canvass did not exist before the respondent's trial began. Just like the respon-

dent in *In re Sydnei V.*, supra, 168 Conn. App. 567–68, the respondent has failed to demonstrate how she was harmed per se by the timing of the *Yasiel* canvass and what she would have done differently if the court had canvassed her before trial began. The respondent has not pointed to any aspect of the court's canvass that was not otherwise in keeping with *In re Yasiel R.* Moreover, the respondent exercised all of the rights articulated by the *Yasiel* canvass, i.e., she was represented by counsel, she testified on her own behalf, and she cross-examined witnesses. The respondent's claim, therefore, fails.

III

The respondent's third claim is that the court could not reasonably have concluded that there was clear and convincing evidence that she had failed to rehabilitate to the degree that she could not be restored as a responsible parent within a reasonable time. We do not agree.

"The trial court is required, pursuant to § 17a-112, to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further . . . such rehabilitation must be foreseeable within a reasonable time." (Internal quotation marks omitted.) *In re Shane M.*, 318 Conn. 569, 585, 122 A.3d 1247 (2015). "The statute does not require [a parent] to prove precisely when [she] will be able to assume a responsible position in [her] child's life. Nor does it require [her] to prove that [she] will be able to assume full responsibility for [her] child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation [she] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [she] can assume a responsible position in [her] child's life. . . . In addition, [i]n determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected the factors that led to the initial commitment, regardless of whether those factors were included in specific expectations ordered by the court or imposed by the department." (Citation omitted; internal quotation marks omitted.) Id., 585–86.

A court's conclusion that a parent has failed to rehabilitate "is drawn from *both* the trial court's factual findings and from its weighing of the facts in assessing whether those findings satisfy the failure to rehabilitate ground set forth in § 17a-112 (j) (3) (B)." (Emphasis in original.) Id., 587-88. Our review of the court's ultimate conclusion "is one of evidentiary sufficiency, that is, whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to

sustaining the judgment of the trial court." Id., 588.

The respondent claims that there is insufficient evidence by which the court could have concluded that she had "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." General Statutes § 17a-112 (j) (3) (B). She does not, however, claim that *any* of the court's underlying factual findings are clearly erroneous, which is significant because the court's factual findings form the basis of its conclusion that the respondent has failed to rehabilitate. In her appellate brief, the respondent emphasizes the relationship that she has with the children, but she does not mention the reasons the children were removed from her care. She did not discuss her mental health issues, her history of substance abuse, and her lack of good judgment with respect to male partners. She offered no explanation for her failure to engage fully in many of the services offered by the department.

The court's memorandum of decision contains a detailed history of the respondent's pattern of substance abuse, including her use of illegal drugs during the termination proceedings despite the specific step to refrain from that activity. The court found that the respondent never came to appreciate the negative effect the use of marijuana had on her capacity to meet the needs of the children, to keep them safe, or, in fact, to keep herself safe. Although the respondent achieved a period of sobriety for approximately six months prior to the end of the trial, the court concluded that the respondent's sobriety was too fragile and untested to lead to the conclusion that she would be able to care for the special needs of L.N. and M.N. within a reasonable time.

On the basis of our review of the record, we conclude that there is clear and convincing evidence to support the court's conclusion that the respondent failed to rehabilitate. The court acknowledged the respondent's love for L.N. and M.N., her desire for reunification, and her wish to have the children live with her and E.T. We agree with the court that the respondent's desires, however sincere, are insufficient to sustain the children and to provide them with a safe, secure, and permanent environment. See *In re Sydnei V.*, supra, 168 Conn. App. 548–49. The court aptly stated that, even if the respondent is able to care for E.T. and has improved her parenting skills, that progress is *too little and too late for the children* who are the subject of the present termination of parental rights petitions. We, therefore, disagree that there is insufficient evidence to support the court's conclusion that the respondent failed to achieve sufficient personal rehabilitation so as to encourage the belief that she can assume a responsible

position in the lives of the children within a reasonable time.

## IV

The respondent's last claim is that the court improperly concluded that it was in the best interests of L.N. and M.N. to terminate her parental rights in them. We do not agree.

"The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment." (Internal quotation marks omitted.) *In re Shyina B.*, 58 Conn. App. 159, 167, 752 A.2d 1139 (2000). This court will overturn the trial court's decision that it is in the best interests of the children to terminate the respondent's parental rights in them only if the court's factual findings are clearly erroneous. *In re Daniel C.*, 63 Conn. App. 339, 367, 776 A.2d 487 (2001). The respondent has not identified any findings of the court that she claims are clearly erroneous.

The substance of the respondent's claim is that it is not in the best interests of the children to terminate her parental rights because she loves them and they love her. Her claim is not a new one and, standing alone, it is insufficient to reverse the judgments terminating her parental rights. "[O]ur courts consistently have held that even when there is a finding of a bond between parent and child, it still may be in the child's best interest to terminate parental rights." (Internal quotation marks omitted.) *In re Luciano B.*, 129 Conn. App. 449, 480, 21 A.3d 858 (2011); see also *In re Rachel J.*, 97 Conn. App. 748, 761, 905 A.2d 1271, cert. denied, 280 Conn. 941, 912 A.2d 476 (2006); *In re Tyqwane V.*, 85 Conn. App. 528, 536, 857 A.2d 963 (2004); *In re Ashley S.*, 61 Conn. App. 658, 667, 769 A.2d 718, cert. denied, 255 Conn. 950, 769 A.2d 61 (2001); *In re Quanitra M.*, 60 Conn. App. 96, 106–107, 758 A.2d 863, cert. denied, 255 Conn. 903, 762 A.2d 909 (2000).

The court found that, although the children enjoy visiting with the respondent, given their "ages and stages of development, and their particular educational and emotional needs, [it was] constrained to conclude that allowing more time for [the] respondent to become able and willing to provide predictably safe, reliable and attentive custodial care for [the children] would unreasonably relegate these children's best interests to a level of uncertainty, without any valid basis . . . for determining that reunification with [her] can practicably be achieved within [a] reasonable period of time . . . ." The court found that to delay termination of the respondent's parental rights would unduly interfere with the children's access to permanency that will enhance their opportunities and potential for healthy human development. We have reviewed the record, considered the briefs and arguments of the parties, and

agree with the court.

The judgments are affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** July 27, 2017, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The parental rights of the respondent father, S.N., in the children also were terminated. He filed a separate appeal to challenge the termination of his parental rights in the children. See *In re Luis N.*, 175 Conn. App. , A.3d (2017).

[2] See *In re Yasiel R.*, 317 Conn. 773, 795, 120 A.3d 1188 (2015).

[3] On August 9, 2012, Judge Frazzini adjudicated the children neglected as to S.N. on the ground that they were exposed to conditions injurious to their well-being. The petitioner filed petitions to terminate the parental rights of S.N. in the children on December 12, 2012. The termination of parental rights petitions as to both the respondent and S.N. were consolidated for trial.

[4] The department alleged that the children were exposed to the immediate risk of physical harm if they remained in the respondent's care due to her inadequate supervision of the children and the substandard conditions of her home. The respondent also was affected by substance abuse, and deteriorating mental health and cognitive functioning.

[5] Given the respondent's continued drug use, the court declined to credit any evidence she proffered to establish that she had acquired the coping skills to deal with environmental changes without relapsing. The court specifically found that the respondent did not acquire those skills because she did not successfully take part in the Family Intervention Center's intensive outpatient services.

[6] The court found that L.T. had a criminal history of convictions sufficiently grave to support the inference that the respondent knew the nature and extent of his unlawful conduct. From 2004 and continuing into 2009, L.T. had been arrested numerous times for drug possession, drug possession with intent to sell, criminal possession of a firearm, and violation of probation. He was sentenced to prison on numerous occasions.

[7] The respondent admitted that in January, 2016, she knew that L.T. had been arrested, but she was willing to let L.T. provide care for E.T. She, however, was unwilling to ask L.T. about "certain things." The court considered the implications of the respondent's "poor parental judgment" in the context of her overall parenting history.

[8] General Statutes § 17a-112 (j) provides in relevant part: "(1) the Department . . . has made reasonable efforts to locate the parent and to reunify the child with the parent . . . unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . . (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court . . . to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent . . . and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

[9] The court found that the department's reunification efforts were reasonable in view of the respondent's history of trauma, transience, poor personal judgment, parenting deficits, and recurrent illegal drug use. Although the department never engaged the respondent in child abuse treatment services, the respondent was fully aware of the sexual trauma M.N. sustained when she was with her father. M.N.'s half-brother, S., a child approximately her age, sexually assaulted her in 2014. The department was engaged with the respondent thereafter, but she was never able or willing to focus on M.N.'s needs to inquire about access to family therapy for the sexual trauma.

[10] The court found that the respondent was unable or unwilling to benefit from the many services provided by the department. She failed to take advantage of individual counseling provided by Williams and was discharged for noncompliance. Although the respondent knew that she was not to use illegal drugs and that she was subject to random drug tests, she consistently tested positive for marijuana and frequently for cocaine until 2016. The

respondent had a poor attendance record at peer support group sessions for drug treatment, and she failed to attend scheduled medication management appointments. Her drug use was refractory to treatment, which resulted in time limited periods of sobriety that are inconsistent with the functional benefits of valid, appropriate reunification services. The respondent began, but did not complete, parenting classes with the Hispanic Health Council. On occasion the respondent cooperated with mental health medication management, but her depression and behavioral issues remained unresolved and intact. The court found that the respondent's inability or unwillingness to benefit from all of the services and treatment provided only to relapse into drug use, constitutes behavior that is inimical to that of a parent who is able or willing to learn from what she has been taught.

[11] The court made the following findings with respect to L.N. and M.N. Both of the children suffer from eczema and asthma.

During his first days in foster care, L.N. had tantrums and engaged in sexualized behaviors with M.N. Because he was not toilet trained, L.N.'s entry into day care was delayed until he was three and one-half years old. In addition to his sexualized behavior, L.N. exhibited signs of having been traumatized, e.g., smearing feces and urinating on himself. He had difficulty in school and in his foster home, had tantrums, and cried in ways that were inappropriate for a five and one-half year old. He was defiant and oppositional. In June, 2014, L.N. was assessed at the Klingberg Family Centers because his oppositional and defiant behaviors had continued. He was diagnosed with generalized anxiety disorder, symptoms of hyperactivity, sleep problems, fears, and an inability to concentrate. He received therapy and gradually was able to sit still for longer periods of time in school. He failed to make academic progress, however. Given his specialized behavior needs, the department arranged for his school to conduct a pupil planning and placement team meeting for him, which led to his receiving special education services.

M.N. has special emotional needs due to her history of sexual trauma. She received therapy at Klingberg Family Centers, where she exhibited fear; physical and verbal aggression toward others; difficulty with fine motor skills, sitting still, paying attention, and concentrating; and learning challenges. M.N. also intentionally urinated on herself at school, which is consistent with trauma. She was diagnosed as a child victim of sexual abuse. She received therapy and was taught relaxation skills appropriate to her age. Despite improvement over the years, M.N. had a very difficult time in school. She struggled to stay on task and was removed from class due to her behavioral issues. She consistently stated that she did not trust S., who had sexually assaulted her, and that she did not want to be near him. Her specialized emotional needs require that her caregivers identify and adhere to a designated and appropriate safety plan to prevent M.N. from being victimized again.

[12] Practice Book § 32a-4 provides in relevant part: "(b) Any party who intends to call a child or youth as a witness shall first file a motion seeking permission of the judicial authority. . . .

"(d) The judicial authority with the consent of all parties may privately interview the child or youth. Counsel may submit questions and areas of concern for examination. The knowledge gained in such a conference shall be shared on the record with counsel and, if there is no legal representation, with the parent."

At the court's request, the respondent and S.N. submitted questions to be asked of the children.

[13] The court then denied the motion for the children to testify.

[14] The respondent asked the court to articulate: (1) the legal basis of its March 18, 2016 order directing the petitioner to have the children present in the courthouse to meet with the judicial authority, particularly in light of the court's having denied the joint motion for the children to testify; (2) the purpose of the court's meeting with the children as it relates to the termination trial; (3) why the attorneys for the parents were excluded from the meeting when a representative of the department and the children's attorney and guardian ad litem were present; (4) what the children, court, and others in the room said or did during the meeting; and (5) what the court learned about the children as a result of the meeting that was new information or information that supported the evidence or contradicted the evidence admitted at trial.

[15] On March 6, 2017, the respondent filed a motion for review of the trial court's denial of her motion for articulation. This court granted the motion for review but denied the relief requested.

[16] "[A respondent] can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the [respondent] of a fair trial; and (4) if subject to harmless error analysis, the [petitioner] has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40, as modified in *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).

[17] For this reason, we will not engage in an analysis under *Mathews* v. *Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), as urged by the respondent.

[18] "[The plain error] doctrine, codified at Practice Book § 60-5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . Implicit in this very demanding standard is the notion . . . that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review. . . . [Thus, an appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice. . . .

"[Our Supreme Court has] clarified the two step framework under which we review claims of plain error. First, we must determine whether the trial court in fact committed an error and, if it did, whether that error was indeed plain in the sense that it is patent [or] readily discernible on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . [T]his inquiry entails a relatively high standard, under which it is not enough for the [respondent] simply to demonstrate that his position is correct. Rather, [to prevail] the party [claiming] plain error [reversal] must demonstrate that the claimed impropriety was so clear, obvious and indisputable as to warrant the extraordinary remedy of reversal. . . ." (Internal quotation marks omitted.) *In re Sydnei V.*, 168 Conn. App. 538, 562–64, 147 A.3d 147, cert. denied, 324 Conn. 903, 151 A.3d 1289 (2016).

[19] See Practice Book § 32a-4 (d) (judicial authority with consent of all parties may privately interview child and knowledge gained in such conference shall be shared on record with counsel).

[20] We further note that the court's prompt report to the parties and their counsel is consistent with Rule 2.9 (b) of the Code of Judicial Conduct, which provides, "[i]f a judge inadvertently receives an unauthorized ex parte communication bearing on the substance of a matter, the judge shall make provision promptly to notify the parties of the substance of the communication and provide the parties with an opportunity to respond." The court gave the respondent an opportunity to respond but neither she nor her counsel chose to do so.

---